INDIANA COAL COUNCIL,
INC., et al., Plaintiffs,

v.

Manuel LUJAN, Jr., et al.,[1] Defendants.

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN the UNITED
STATES, et al., Plaintiffs,

v.

Manuel LUJAN, Jr., et al., Defendants.

Civ. A. Nos. 87–1016 (JHG),
87–1020 (JHG).

United States District Court,
District of Columbia.

Oct. 8, 1991.

See also 118 F.R.D. 264.

---

**1.** Although these consolidated actions were initiated against Donald P. Hodel, as Secretary of the Interior, and Jed O. Christensen, as Director of the Office of Surface Mining Reclamation and Enforcement ("OSM" or "OSMRE"), Manuel Lujan, Jr. is presently Secretary of the Interior and Harry M. Snyder is presently Director of OSM, and thus, they have been substituted as party defendants pursuant to Fed.R.Civ.P. 25(d).

Warner W. Gardner, James R. Bird, Shea & Gardner, Washington, D.C., Mark L. Morgan, Chambersville, Ky., David A. Doheny, VP and Gen. Counsel, Elizabeth S.

Merritt, Asst. Gen. Counsel, NTHP, Washington, D.C., for plaintiffs.

Lisa K. Hemmer, Alfred T. Ghiorzi, Attys. U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION
## AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiffs Indiana Coal Council, Inc., National Coal Association, American Mining Congress, (collectively, "Industry plaintiffs"); National Trust for Historic Preservation in the United States; Society of Professional Archeologists; National Conference of State Historic Preservation Officers; Kentucky Organization of Professional Archeologists; Council for West Virginia Archaeology; Council for the Conservation of Indiana Archaeology, Inc.; and Ohio Archaeology Council (collectively, "National Trust plaintiffs") initiated these consolidated actions for declaratory and injunctive relief against the Secretary of the Interior, the Director of OSM, and the United States Department of the Interior (collectively, "defendants" or "Federal defendants"). Industry plaintiffs contend that the Secretary of the Interior (the "Secretary") has promulgated regulations under the Surface Mining Control and Reclamation Act ("SMCRA" or the "Act"), 30 U.S.C. § 1201 *et seq.*, that place burdensome responsibilities for identifying and evaluating unknown historic and archeological resources on applicants for state mining and exploration permits. In particular, Industry plaintiffs challenge provisions in the rulemaking that a state regulatory authority ("SRA"), in a permit application or as a condition of permit issuance, may require surveys to identify unknown historic sites or may condition a permit to prevent or mitigate damages to those sites. They seek an Order remanding the regulations promulgated on February 10, 1987 to the Secretary in order to replace his preambles with a clear and consistent statement of what the regulations require or to eliminate the duties imposed by said regulations.

In contrast, National Trust plaintiffs [2] argue that although the regulations are authorized, they do not go far enough in implementing the Secretary's responsibilities under the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.* Consequently, National Trust plaintiffs seek a declaration that OSM [3] has failed to comply with the NHPA and SMCRA by failing to ensure the identification and consideration of historic properties subject to adverse effects from surface mining, a court-supervised plan for protection of historic properties, and an injunction against future unspecified undertakings.

The parties have since filed cross motions for summary judgment.[4] For the following reasons, Industry plaintiffs' motion is denied, National Trust plaintiffs' motion is granted, and Federal defendants' motion denied.

## I. BACKGROUND

A. Statutory Background·

### 1. The NHPA

The NHPA was enacted by Congress in 1966 to implement a congressional policy to encourage the preservation and protection of America's historic and cultural resources. The NHPA also created the Advisory Council on Historic Preservation, an independent federal agency, which is responsible for, among other things, "review[ing] the policies and programs of Federal agencies and recommend[ing] to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and

---

2. The Society for American Archaeology and the Society for Historical Archaeology have filed a memorandum as *amicus curiae* on behalf of National Trust plaintiffs.

3. OSM is charged with regulating the surface effects of coal mining in the United States.

4. Federal defendants have filed a motion to dismiss and cross-motion for summary judgment.

programs carried out under [the NHPA]." 16 U.S.C. §§ 470i, 470j.

Section 110 of the NHPA, *Id.* § 470h–2, defines the responsibilities of federal agencies for historic preservation. Section 110(d) requires that all federal agencies carry out their programs and projects, "including those under which any Federal assistance is provided or any Federal license, permit, or other approval is required," in accordance with the purposes of the NHPA and that all agencies give consideration to programs and projects that will further the purposes of the NHPA. *Id.* § 470h–2(d).

Similarly, Section 106 of the NHPA provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State ... shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470v of this title a reasonable opportunity to comment with regard to such undertaking.

*Id.* § 470f. The Advisory Council has promulgated regulations that implement the requirements of the NHPA by setting out a specific consultation process in which federal agencies must engage in order to satisfy their responsibilities under Section 106. *See* 36 C.F.R. Part 800.

The requirements of Section 106 apply to all federal or federally assisted undertakings that may affect historic properties.[5] Section 800.2(*o*) of the Advisory Council's regulations defines the term "undertaking" as:

> Any project, activity, or program that can result in changes in the character or use of historic properties, if any such historic properties are located in the area of potential effects. The project, activity, or program must be under the direct or indirect jurisdiction of a Federal agency or licensed or assisted by a Federal agency. Undertakings include new and continuing projects, activities, or programs and any of their elements not previously considered under section 106.

36 C.F.R. § 800.2(*o*).

One type of undertaking by OSM that may adversely affect historic properties is the Secretary's approval of applications for primacy by SRAs. Another type of undertaking by OSM that may adversely affect historic properties is OSM's periodic approval of amendments to state programs once primacy has been granted to a state, i.e. OSM has delegated its regulatory authority to a state. Similarly, OSM's authorization of the issuance of permits for the surface mining of coal, on federal lands and in those states where OSM is the primary regulatory agency, is also an undertaking.

Pursuant to the Council's regulations, the agency must identify those historic properties that may be affected by the undertaking. The agency is responsible for identifying not only previously recorded properties but also those that are eligible for inclusion in the National Register and yet are unknown or unrecorded prior to the identification process. In order to identify historic properties, agencies initially must review available data and consult with the State Historic Preservation Officer ("SHPO") and other interested parties. *Id.* § 800.4(a)(1). Based on this review, the agency "should determine any need for further actions, such as field surveys and predictive modeling, to identify historic properties." *Id.* § 800.4(a)(2).

---

5. Historic property is defined as:
   any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register. This term includes, for the purposes of these regulations, artifacts, records, and remains that are related to and located within such

properties. The term "eligible for inclusion in the National Register" includes both properties formally determined as such by the Secretary of the Interior and all other properties that meet National Register listing criteria. 36 C.F.R. § 800.2(e).

Once historic properties have been identified, the agency, in consultation with the SHPO, must determine the nature of the effect that the proposed undertaking will have on those historic sites. *Id.* § 800.5. If the agency and the SHPO agree that the undertaking will have no effect or no adverse effect on any historic properties, then the agency may proceed with the undertaking as planned. *Id.* § 800.5(b). If, however, the parties agree that there could be an adverse effect on historic property, or if the SHPO or the Advisory Council disagree with the agency's determination of effect, further consultation is required. *Id.* §§ 800.5(c), (d), (e).

Under 36 C.F.R. § 800.5(e), the agency shall notify the Council and shall consult with the SHPO to seek ways to reduce the effects on historic properties. Any affected person or group may ask to participate in the process, and, at a minimum, the consulting parties include the agency and the SHPO and often the Advisory Council. *Id.* § 800.5(e)(1).

If the parties to the consultation agree upon how the effects will be taken into account, they may execute a Memorandum of Agreement ("MOA"). *Id.* § 800.5(e)(4). If the agency carries out the terms of the MOA, the agency will have satisfied its Section 106 responsibilities. However, "[f]ailure to carry out the terms of a Memorandum of Agreement requires the Agency Official to resubmit the undertaking to the Council for comment in accordance with § 800.6." *Id.* § 800.6(c)(1).

In addition to the case-by-case review process described above, there are two alternative methods for agencies to comply with the requirements of Section 106: a Programmatic Agreement or counterpart regulations. A Programmatic Agreement ("PA"), formerly referred to as a Programmatic Memorandum of Agreement ("PMOA"), may be used as an alternative to case-by-case review when an agency is involved in a large and complex project, or when a program involves a class of undertakings that would otherwise require numerous and repetitive individual requests for comments. *Id.* § 800.13(a). A PA is negotiated between the Advisory Council, the agency, and either the SHPO with jurisdiction over the program or the National Conference of State Historic Preservation Officers in the case of a program that involves more than one state. *Id.* § 800.-13(b). As with the MOA, an approved PA "satisfies the Agency's section 106 responsibilities for all individual undertakings carried out in accordance with the agreement until it expires or is terminated." *Id.* § 800.13(e). If, however, the terms of the PA are not carried out or if such agreement is terminated, the Agency Official shall comply with the case-by-case review process outlined in 36 C.F.R. §§ 800.4–800.6.

Counterpart regulations provide the third method of compliance with Section 106. *Id.* § 800.15. As the Council's regulations provide, "In consultation with the Council, agencies may develop counterpart regulations to carry out the section 106 process. When concurred in by the Council, such counterpart regulations shall stand in the place of these regulations for the purposes of the agency's compliance with section 106." *Id.*

### 2. SMCRA

Section 522(e) of SMCRA, 30 U.S.C. § 1272(a)(3), protects certain properties by providing:

Upon petition pursuant to subsection (c) of this section, a surface area may be designated unsuitable for certain types of surface coal mining operations if such operations will—

(A) be incompatible with existing State or local land use plans or programs; or

(B) affect fragile or historic lands in which such operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems; or

(C) affect renewable resource lands in which such operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products, and such lands to include aquifers and aquifer recharge areas; or

(D) affect natural hazard lands in which such operations could substantially endanger life and property, such lands to include areas subject to frequent flooding and areas of unstable geology.

OSM, a division of the United States Department of the Interior, was created by SMCRA and is responsible for issuing permits for the surface mining of coal; granting or denying approval to state regulatory authorities for the primary regulation of surface coal mining; approving or denying proposed amendments to state programs; providing annual grants to fund state programs; and monitoring the state programs through a process of oversight. OSM may delegate its regulatory authority to states through delegation of "primacy." Primacy is granted to the SRA if the state has demonstrated both that it has adequate personnel and other resources to enforce the requirements of SMCRA within the state and that the state's statutory and regulatory requirements are no less stringent than or less effective than SMCRA and its regulations. *See* 30 C.F.R. Part 730. OSM also grants funds, on an annual basis, to states that have received grants of primacy from OSM, and OSM places binding conditions upon the acceptance and expenditure of those funds by the SRAs. 30 C.F.R. Part 735.

SMCRA recognizes that "[t]he Secretary, acting through the Office, shall ... perform such other duties as may be provided by law and relate to the purposes of this chapter." 30 U.S.C. § 1211(c)(13). In addition, OSM has incorporated into its own regulations the requirement that "[e]ach regulatory program shall, to avoid duplication, provide for the coordination of review and issuance of permits for surface coal mining and reclamation operations with applicable requirements of ... The National Historic Preservation Act of 1966, as amended." 30 C.F.R. § 773.12.

### B. Factual Background

In March 1979, OSM promulgated regulations, pursuant to SMCRA, that offered protection to historic properties threatened by the surface mining of coal operations. SMCRA prohibits mining that affects historic properties that are listed on the National Register of Historic Properties, but the statute does not explicitly protect historic properties *eligible* for listing in the National Register. Litigation before this Court challenged OSM's 1979 regulations as beyond the scope of SMCRA. *In re Permanent Surface Mining Regulation Litigation*, No. 79–1144 (D.D.C.1980). On November 27, 1979, however, OSM voluntarily suspended those provisions of the regulations to the extent such rules applied to any places eligible for listing.

On November 6, 1980, the Advisory Council, OSM, and the National Conference of State Historic Preservation Officers entered into a PMOA, pursuant to 36 C.F.R. § 800.8 (1980), that required OSM to provide the Advisory Council with an opportunity to comment on applications for primacy by state programs prior to OSM's approval of those applications. In addition, OSM agreed in the PMOA to consult with the Advisory Council prior to approving amendments to state programs, and to require the SRAs to consult with their SHPOs prior to issuing mining permits. The PMOA also placed a duty on OSM to propose regulations, by May 6, 1981, that would establish a procedure for the states to follow regarding OSM's duties under the NHPA. The PMOA required that OSM provide the Advisory Council with an opportunity to comment on the regulations and to take the Advisory Council's comments into account in promulgating its final regulations.

On July 30, 1985, the Acting Director of OSM addressed the Public Lands Subcommittee (the "Subcommittee") of the House of Representatives Committee on Interior and Insular Affairs. The Subcommittee had requested that OSM respond to specific questions, and the response to those questions was submitted in tandem with the OSM Director's testimony on July 30, 1985. At that time, OSM stated to the Subcommittee that "[t]he provisions for the consideration of historic sites is required through the approved State program permitting process." Response to Subcommittee's

Questions on Historic Preservation; July 30, 1985; attached as Appendix 20 to National Trust Plaintiffs' Motion for Summary Judgment ("NT's Motion"), at 2. OSM maintained to the subcommittee that the SRAs may require applicants to conduct field surveys and undertake appropriate mitigation. OSM explained that additional requirements on the SRAs are found in OMB Circular A–102, wherein: "[G]rantees assure that they will assist the Federal grantor in its compliance with section 106 ... by consulting with the SHPO ..., notifying the Federal grantor of the existence of [listed or eligible historic] properties, and complying with all requirements established by the grantor to avoid or mitigate effects upon such properties." Appendix 20, at 3. OSM explained the status of the 1980 PMOA as follows: "In 1980, OSM entered into a PMOA with the Advisory Council on Historic Preservation that addressed the approval of State regulatory programs. That PMOA is no longer relevant since State programs have been approved. OSM has had several meetings with the Advisory Council to explore the scope and content of its program." Appendix 20, at 3. With regard to whether any law prevents OSM from protecting historic properties, the agency responded: "OSM is responsible for regulating surface coal mining activities that by their nature, could disturb or destroy historic properties.... [W]e know of no legal requirement which conflicts with or impedes fulfilling our historic preservation agreement." Appendix 20, at 7.

On September 27, 1985, the Executive Director of the Advisory Council corresponded with Dr. Brent Wahlquist, the official then designated by OSM to respond to questions regarding historic properties. In that correspondence, the Advisory Council stated:

> The regulatory language proposed by the petition would in effect pass through the responsibility for compliance with Section 106 of the ... NHPA ... to the SRAs. We are not certain that a legitimate statutory basis exists for such a direct delegation of responsibility.... OSM's po-

sition on this matter has been inconsistent, in our view. On the one hand, OSM has regularly held that "... section 106 ... does not apply directly to decisions by a State regulatory authority" (Jed Christensen testimony, House Public Lands Subcommittee, July 30, 1985). On the other hand, OSM has argued before the U.S. District Court for the District of Columbia that "the Secretary ensures that each state program ... provides for the coordination of permit issuance with the NHPA" (Government brief in re: *Permanent Surface Mining Regulation Litigation,* Civil Action No. 79–1144, page 82). OSM's argument persuaded the court that "the Secretary's responsibility under the NHPA are [sic] carried out via other regulations that, for example, require that permit issuance be coordinated with the NHPA".... If OSM did not mean to convince the court that the Secretary's responsibilities under Section 106 were adequately fulfilled by passing through such responsibilities to the SRA, it is difficult to imagine what OSM did mean. OSM has further acknowledged ... that OMB circular A–102 ... requires each SRA to "assist the Federal grantor in its compliance with Section 106 ..." by consulting with the ... SHPO ... on the identification of historic properties, notifying OSM of historic properties subject to effect, and complying with whatever OSM requires with respect to avoidance or mitigation of such effects.... This requirement appears to delegate the "legwork" of Section 106 review to the SRA, while retaining in OSM the actual responsibility to comply with the statute.

Letter from Robert R. Garvey, Jr., Executive Director, Advisory Council on Historic Preservation; to Dr. Brent Wahlquist; dated September 27, 1985; attached as Appendix 21 to NT's Motion, at 1–2.

On February 10, 1987, OSM promulgated its final rules concerning the protection that state regulatory agencies under SMCRA must afford to historic properties that may be affected by surface coal mining operations. 52 Fed.Reg. 4244 *et seq.*

On March 10, 1987, then Acting Executive Director of the Advisory Council on Historic Preservation, John M. Fowler, corresponded with the Director of OSM, defendant Christensen. In that correspondence, the Advisory Council indicated:

> We understand and agree that it would be burdensome and inappropriate to carry out OSMRE's Section 106 responsibilities by providing for review of individual State permit actions through the standard process set forth in our regulations. Our regulations, however, provide agencies with two alternatives to such case-by-case review. First, under 36 CFR Sec. 800.13 an agency can execute a Programmatic Agreement (PA) with the Council, establishing an alternative review process.... As you know, OSMRE entered into such an agreement with the Council and the National Conference of State Historic Preservation Officers in 1980. However, OSMRE did not implement the agreement, and has not to date complied with Section 106 in its approval of State programs, approval of amendments to such programs, or provision of assistance to the States....
>
> An alternative to a PA, and to use of the standard process set forth in our regulations, is to develop counterpart regulations. 36 CFR Sec. 800.15 permits agencies to develop counterpart regulations in consultation with the Council; when concurred in by the Council, such regulations can be used in lieu of our regulations to govern the agency's compliance with Section 106. As your permanent program regulations were not developed in consultation with the Council, nor concurred in by it, they cannot be viewed as counterpart regulations.

Letter from John M. Fowler to Christensen; dated March 10, 1987, attached as Appendix 25 to NT's Motion.

## II. DISCUSSION

■ In viewing a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.*

*Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The factual allegations of the complaint must be presumed true and liberally construed in favor of plaintiff. *Shear v. National Rifle Association*, 606 F.2d 1251, 1253 (D.C.Cir.1979); 5A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1357, p. 304 (1990). The plaintiff is entitled to all favorable inferences which may be drawn from those allegations. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

In contrast, summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### A. Federal Defendants' Motion to Dismiss

#### 1. *Nature of Relief*

■ OSM argues first that SMCRA fails to provide the basis for the mandatory and injunctive relief sought by the National Trust plaintiffs. Specifically, Federal defendants contend that Section 526 of SMCRA does not allow this United States District Court to exercise jurisdiction over a claim for mandatory and injunctive relief

compelling compliance with Section 106 of the NHPA.

Section 526(b) of SMCRA, which provides the jurisdictional basis for the National Trust plaintiffs' rulemaking review claim, expressly states: "The court may affirm, vacate, or modify any order or decision or may remand the proceedings to the Secretary for such further action as it may direct." 30 U.S.C. § 1276(b). The relief requested by plaintiffs would be based on a determination that the disputed regulations are inconsistent with law because they violate the NHPA.

Although the statute does not explicitly state that a Court may order the Secretary to come into compliance with the NHPA, it certainly does not foreclose that possibility. It is clear from the plain language of SMCRA that the Court has broad power to design an Order that, if appropriate, would "remand" the rulemaking, or portions thereof, to the Secretary or "direct" the Secretary to comply with the NHPA. Consequently, defendants' argument must be rejected.

▉▉▉▉ Defendants also contend that the mandamus provision, 28 U.S.C. § 1361, provides no basis for jurisdiction or for the relief sought by National Trust plaintiffs. It is well-settled that mandamus is an extraordinary remedy and is not proper when alternative statutory remedies are available. *Telecommunications Research and Action Center v. Federal Communications Commission*, 750 F.2d 70, 78 (D.C.Cir.1984). This is true whether the alternate remedies are judicial or administrative. *Cartier v. Secretary of State*, 506 F.2d 191, 199 (D.C.Cir.1974), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). Accordingly, defendants argue, the legal remedies provided for in SMCRA are exclusive and preclude a separate jurisdictional basis in 28 U.S.C. § 1361.

The fact that various legal remedies are noted in § 1361 does not preclude mandamus in an appropriate case. In fact, the provision on which plaintiffs rely, 30 U.S.C. § 1276(b), is broad enough to include relief crafted in accordance with 28 U.S.C. § 1361.

Defendants further contend that even assuming mandamus could be employed here for purposes of jurisdiction, it cannot provide a basis for relief for actions that are discretionary with the agency; although mandamus is appropriate to compel performance of a duty that has been withheld or refused, it may not be utilized to compel a particular discretionary result in the exercise of a mandatory duty. *See Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 234–41, 106 S.Ct. 2860, 2868–72, 92 L.Ed.2d 166 (1986); *Wilbur v. United States*, 281 U.S. 206, 218, 50 S.Ct. 320, 324, 74 L.Ed. 809 (1930).

It does not follow, however, that National Trust plaintiffs' claims must be dismissed. Section 106 of the NHPA imposes mandatory duties on federal agencies. *See Ely v. Velde*, 451 F.2d 1130, 1137 & n. 21 (4th Cir.1971). Although the implementation of those duties involves discretionary decisions, the mandatory duties of Section 106 include the responsibility to follow certain procedures when the agency's undertakings may affect historic properties. *See* 36 C.F.R. Part 800. As National Trust plaintiffs persuasively argue, it is the procedures that are mandatory even though the decisions made with respect to individual undertakings are discretionary, and the issue here is whether those procedures comply with federal law. Consequently, defendants' claim that mandamus relief cannot be granted must be rejected.

*2. Sovereign Immunity*

▉▉▉ Defendants also contend that the NHPA and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, 701 *et seq.*, provide no bases for jurisdiction and that, as a result, there has been no waiver of sovereign immunity, a prerequisite to a court's review of a case against the federal government. As a preliminary matter, however, National Trust plaintiffs make clear that "the NHPA does not provide an independent basis for jurisdiction, and the plaintiffs did not assert it as such." National Trust Plaintiffs' Memorandum in Reply and Response to Federal Defendants' Motion to Dismiss ("NT Plaintiffs' Re-

sponse"), at 3–4. Moreover, the APA does not provide a basis for subject matter jurisdiction here, *see Califano v. Sanders,* 430 U.S. 99, 104–05, 97 S.Ct. 980, 983–84, 51 L.Ed.2d 192 (1977), and "plaintiffs have not relied on it." NT Plaintiffs' Response, at 4 n. 2. Rather, plaintiffs contend, this Court has jurisdiction over the plaintiffs' NHPA claims because plaintiffs have raised a federal question, *see* 28 U.S.C. § 1331, and because plaintiffs seek a declaratory judgment, *see* 28 U.S.C. §§ 2201–02, and mandamus relief, *see* 28 U.S.C. § 1361.

OSM's argument that National Trust plaintiffs' reliance on federal question jurisdiction is barred by sovereign immunity is rejected.[6] In the twenty-five years since the NHPA was enacted, numerous enforcement suits have been litigated and decided, and this Court is not aware of a single ruling in which an NHPA claim was barred by the doctrine of sovereign immunity. Moreover, in 1976, Congress withdrew sovereign immunity as a defense in suits against the United States, except where money damages are claimed as relief. *See* 5 U.S.C. §§ 702–03. The National Trust plaintiffs have not applied for money damages in this case. Finally, defendants cannot argue that Congress' waiver of sovereign immunity is dependent on whether a plaintiff alleges the APA as a basis for subject matter jurisdiction. Rather, sovereign immunity is waived as long as federal officers are named as defendants in their official capacity, a requirement that has been satisfied in this case. As the Court of Appeals for the Second Circuit has explained: "We were ... mistaken ... that the 1976 amendments to the APA 'did not remove the defense of sovereign immunity in actions brought under § 1331.'" *B.K.*

*Instrument, Inc. v. United States,* 715 F.2d 713, 725 (2d Cir.1983) (citations omitted).[7]

### 3. Mootness

■ Defendants next argue that to the extent plaintiffs seek relief in the form of a plan or program for the Secretary to come into compliance with Section 106 of the NHPA, that request is mooted by OSM's activities subsequent to the rulemaking. OSM's reliance on informal activities conducted subsequent to the regulations, however, misses the point. Those activities only render the case moot if the Court decides that they successfully bring OSM into compliance with Section 106. *See Don't Tear It Down, Inc. v. General Services Administration,* 401 F.Supp. 1194, 1199 (D.D.C.1975). As a preliminary matter, however, OSM's own assertion that the agency has complied with Section 106 is not sufficient to prove compliance.

### 4. Ripeness

■ OSM also complains that the claims of National Trust plaintiffs are not ripe for review because plaintiffs have failed to allege the existence of a cognizable harm flowing from a formal, agency decision. Specifically, defendants contend, the Secretary and OSM are in the process of working with the states to revise and amend state programs and that National Trust plaintiffs' claims will, therefore, not be ripe until implementation of the 1987 regulations is complete. Ripeness, however, is not a cognizable challenge here.

The primary concern in assessing the ripeness of a preenforcement challenge to agency action is "the fitness of the issue[ ]

6. Federal defendants failed to raise the defense of sovereign immunity in their Answer and did not discuss the issue, other than in a footnote, until their reply brief. Although it is questionable whether defendants' defense was raised timely under Fed.R.Civ.P. 12(b), the Court has addressed the merits of defendants' sovereign immunity claim.

7. In their Reply to Federal Defendant's [sic] Response to New and Factual Materials ("NT Plaintiffs' Surreply"), National Trust plaintiffs urge the Court to imply a waiver of sovereign

immunity under the NHPA. Specifically, plaintiffs contend that because the NHPA directly authorizes recovery of attorneys' fees against the United States for meritorious enforcement actions, Congress clearly intended to waive sovereign immunity for claims under the NHPA. Because the Court has already found a waiver of sovereign immunity under the APA and because waivers are not to be construed broadly, as would be required were the Court to accept plaintiffs' attenuated NHPA analysis, this aspect of plaintiffs' argument is rejected.

for judicial decision." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). A secondary concern under the ripeness doctrine is the hardship to the parties of withholding court consideration. *American Petroleum Institute v. Environmental Protection Agency,* 906 F.2d 729, 739 n. 13 (D.C.Cir.1990).

Under the Court of Appeals' decision in *Eagle–Picher Indus. v. Environmental Protection Agency,* 759 F.2d 905, 915 (D.C.Cir.1985), the second component presents no difficulty. As the Court there explained:

> [E]xcept where events occur or information becomes available after the statutory review period expires that essentially create a challenge that did not previously exist, or where a petitioner's claim is, under our precedents, *indisputably* not ripe until the agency takes further action, we will be very reluctant, in order to save a late petitioner from the strictures of a timeliness requirement, to engage in a retrospective determination of whether we would have held the claim ripe had it been brought on time.... Congress intended to provide prompt, uniform "pre-enforcement" review of [Comprehensive Environmental Response, Compensation, and Liability Act of 1980] CERCLA regulations to a broad class of petitioners, in order to avoid needless delays in the implementation of an important national program.... In determining a regulation's ripeness for review, courts should accord heavy weight to this sort of strong congressional proclamation of an agency's interest in the timing of review of its regulations.

*Id.* at 914, 916 (emphasis in original).

The *Eagle–Picher* exception clearly applies here. Congress has determined that a challenge to regulations promulgated pursuant to SMCRA is only timely if brought within a 60–day period. As prescribed by SMCRA, "A petition for review of any action subject to judicial review under this subsection shall be filed in the appropriate Court within sixty days from the date of such action, or after such date if the peti-

tion is based solely on grounds arising after the sixtieth day." 30 U.S.C. § 1276(a)(1).

Accordingly, the Court must consider whether the issues raised are fit for judicial review. Courts normally find an issue fit if it is purely legal or one of legislative intent and if the agency's action represents its final word on the subject. *Association of American Railroads v. Interstate Commerce Commission,* 846 F.2d 1465, 1469–70 (D.C.Cir.1988). The regulations challenged here were promulgated in 1987, and OSM has certainly had ample opportunity to "crystallize" its position.

The Court of Appeals for the District of Columbia Circuit recently rejected a ripeness challenge similar to that raised by OSM. *See National Wildlife Federation v. Hodel,* 839 F.2d 694 (D.C.Cir.1988) ("*NWF*"). In *NWF,* Industry challenged the speculative nature of the plaintiffs' claims. The OSM regulations at issue in that case allowed greater discretion and more relaxed environmental standards than the previous regulations had allowed. Nonetheless, Industry argued that the regulations "remain[ed] susceptible to interpretive constructions in which they would be every bit as stringent" as the earlier standards, and thus the plaintiffs' claims were premature. *Id.* at 708. The Court of Appeals rejected that argument:

> It strains credulity ... to suggest that the Secretary, in abandoning minimum standards, sought to encourage mining concerns to exceed the previous regulatory floors. Mining concerns were, after all, free to undertake extra precautions under the 1979 regulations; the paramount impact of the 1983 deletions is to position Industry to do less rather than more....

*Id.* As in *NWF,* OSM's argument that it may eventually do more than what is required by the 1987 regulations, and therefore, that plaintiffs' claims are premature is insufficient as a matter of law.

### 5. Lack of Prosecution

OSM next argues that Count II and Count III of the National Trust plaintiffs' Complaint must be dismissed because the

plaintiffs have not moved for summary judgment on those claims. Defendants urge the Court to dismiss those counts for lack of prosecution.

The fact that plaintiffs did not move for summary judgment on those counts does not necessarily mean that plaintiffs have failed to prosecute their case. Nevertheless, in light of this Court's opinion, Count II and Count III are dismissed without prejudice.

### 6. Venue

OSM also contends that challenges to actions of state regulatory authorities may not be brought in this forum because SMCRA specifically provides that challenges against the SRAs must be brought "only in the judicial district in which the surface coal mining operation complained of is located." 30 U.S.C. § 1270(c)(1). Defendants, however, misconstrue the nature of plaintiffs' case. National Trust plaintiffs are not challenging any individual state permits or any specific actions of the SRAs; rather, they are challenging the actions of OSM.[8]

### B. Cross–Motions for Summary Judgment

#### 1. Adequate Statement of Basis and Purpose?

■ As a preliminary matter, Industry plaintiffs contend that an inquiry into the validity of the regulations at issue is premature because the Secretary's statement of basis and purpose is so imprecise and self-contradictory as to render meaningful review impossible. Specifically, Industry plaintiffs contend that the Secretary has failed to define the statutory authority for the regulations and that he has failed to explain when SRAs are required, rather than merely authorized, to make decisions with respect to historic properties. The Court cannot accept Industry plaintiffs' contentions.

It is axiomatic that courts "cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) (*"Chenery I"*). Consequently, the basis of the agency action must:

be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'

*Securities and Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (*"Chenery II"*) (citations omitted).[9] A *post hoc* rationalization by counsel or by the responsible agency in the course of litigation cannot remedy the agency's failure to provide an adequate, contemporaneous explanation. *See Action on Smoking and Health v. CAB,* 713 F.2d 795, 800 (D.C.Cir.1983).

Nevertheless, the preamble here adequately explains the statutory basis for the rules. The Secretary provided in the Federal Register nearly a full page analysis of the authority for the 1987 regulations. Specifically, the preamble explains that SMCRA "requires the Secretary to promulgate regulations covering a permanent regulatory program and establishing procedures and requirements for State programs." Administrative Record, Volume I ("A.R.I") 542; 52 Fed.Reg. 4244. Furthermore, while the NHPA imposes obligations on OSM, as a federal agency, to ensure consideration of historic properties in the promulgation of federal regulations and federal programs, *see* A.R.I 542–43, the preamble makes clear that the authority to promulgate regulations for surface mining stems from SMCRA. The NHPA does not authorize federal agencies, except for the Advisory Council, to promulgate regulations; instead, it requires that when an agency establishes regulatory programs, it

---

**8.** OSM concedes that venue is proper here for plaintiffs' rulemaking review claim.

**9.** The explanatory duty of the agency has since been codified at 5 U.S.C. § 553(c).

must ensure consideration of historic effects.

Industry complains further that the preamble is inadequate because the regulations allow an SRA to order, in its discretion, field investigations and to take other mitigative measures to protect historic properties, but they fail either to compel or to prohibit such actions by the SRA. However, OSM explained in the preamble that it intended to leave the discretion to the SRAs to make those decisions on a state-by-state basis.

In any event, Industry plaintiffs' suggestion that the regulations should be remanded because of a lack of clarity is not the rule in this Circuit. As the Court of Appeals for the District of Columbia Circuit explained, " 'While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of *less than ideal clarity* if the agency's path may be reasonably discerned.' " *Eagle–Picher Industries, Inc. v. Environmental Protection Agency,* 822 F.2d 132, 141 (D.C.Cir.1987) (emphasis added) (quoting *Bowman Transportation v. Arkansas–Best Freight System,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974)).

### 2. Authority for Regulations?

■ Industry plaintiffs next contend that SMCRA does not expressly require the informed decisionmaking envisioned in the regulations and that the NHPA cannot impose them on the states. Specifically, Industry plaintiffs object to provisions of the 1987 rules authorizing SRAs to impose on permit applicants the requirement to conduct field investigations or surveys to discover unknown sites. Industry plaintiffs also object to corresponding requirements with respect to coal-exploration permits. Finally, they question the authority of the Secretary to impose mitigation requirements. The Court, however, cannot accept Industry plaintiffs' restrictive reading of the statute, for SMCRA clearly authorizes OSM to issue regulations concerning identification and mitigation of harm to historic properties.

In Section 702 of SMCRA, Congress recognized that OSM is not governed solely by the requirements of SMCRA itself in carrying out its programs. 30 U.S.C. § 1292. Rather, OSM is required to comply with a wide variety of other federal laws, *"including, but not limited to"* ten statutes, most of which are environmental protection laws, and none of which are "superced[ed], amend[ed], modif[ied], or "repeal[ed]" by SMCRA.[10] *Id.* § 1292(a). Significantly, the list of statutes cited as examples in § 1292(a) is not exclusive, and although the NHPA is not specifically listed, it is implicitly and presumptively included, and OSM has never disputed its obligation to comply with the requirements of the NHPA.

Furthermore, Sections 201(c)(2) and 501(b) of SMCRA specifically authorize OSM to issue regulations in fulfillment of its legal duties. 30 U.S.C. §§ 1211(c)(2), 1251(b). In particular, Section 201(c) authorizes the Secretary to "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions" of SMCRA. 30 U.S.C. § 1211(c)(2). And the Court of Appeals for the District of Columbia Circuit has affirmed this broad grant of rulemaking authority in *In re Permanent Surface Mining Regulation Litigation,* 653 F.2d 514, 525 (D.C.Cir.) *(en banc ),* cert. denied sub nom., *Peabody Coal Co. v. Watt,* 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981). In that cause, the Court of Appeals upheld the Secretary's authority to impose information requirements for permit applicants beyond those requisites set forth in the Act. As the Court noted, "[T]he explicit information

---

**10.** Industry plaintiffs also apparently argue that SMCRA and the NHPA are conflicting and inconsistent and thus, that SMCRA implicitly supercedes the requirements of the NHPA with respect to OSM. Only when there is a "positive repugnancy" between two laws will they be deemed irreconcilable. *United States v. Borden Co.,* 308 U.S. 188, 198–99, 60 S.Ct. 182, 188–89,

84 L.Ed. 181 (1939). Since SMCRA itself requires OSM to strike a balance between the protection of the environment and the nation's need for coal, 30 U.S.C. § 1202, it is certainly consistent with the Secretary's mandates under SMCRA to require that historic and cultural aspects of the environment be identified and considered.

provisions included in [SMCRA] should be supplemented to guarantee its effective implementation." 653 F.2d at 522. The Court refused to strike the information requirements in the regulations on the basis of deference to the states because

ultimate responsibility for guaranteeing effective state enforcement of uniform nationwide minimum standards lies with the Secretary, and his duty to disapprove proposed state programs that he considers ineffective may not be obstructed by a policy of judicial deference to the state agencies proposing those programs. This is particularly true when it comes to seeking the information from the permittees on which his oversight will be based.

*Id.* at 523. The Court reasoned that the Secretary had only "purported to promulgate *minimum* information requirements, and has not sought to limit the states' ability to require *further* data from applicants." *Id.* at 526 (emphasis in original).

Moreover, the Court found that the information requirements in sections 507 and 508 were not limits on the Secretary's authority. As the Court of Appeals explained, "Because of the importance of information to a proper decision by the regulatory authority and to effective oversight by the Secretary, Congress included a detailed list of the *type* of information that would have to be at the state's disposal. Such a list is not necessarily exhaustive." *Id.* at 526 (emphasis in original). The Court relied, in part, on the following legislative history: "To meet this problem the bill delineates in detail *the type of information* required in permit applications in sections 507 and 508 and the criteria for assessing the merits of the application in section 510." *Id.* (emphasis in original) (quoting H.R.Rep. No. 218, 95th Cong., 1st Sess. 91 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 627).

Finally, the Court also noted that the legislative history with regard to environmental performance standards, section 515, made absolutely clear the expectation that the Secretary would flesh out the require-

ments in his regulations. Citing the legislative history, the Court wrote, " 'The committee.... bases its approval of H.R. 2 on the expectation that Federal regulations promulgated under the act will fully implement the environmental performance standards. Obviously, the mere reproduction of the statutory environmental performance standards in the regulations would be inadequate.' " *Id.* at 527 (quoting H.R.Rep. No. 218, 95th Cong., 1st Sess. 85 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 593, 622).

The Industry plaintiffs also have argued that the mitigation measures authorized or required by 30 C.F.R. § 780.31 and § 784.17 exceed the statutory authority of SMCRA. But their argument fails to recognize the difference between subparagraphs (a) and (b) of the mitigation provisions.

Subparagraph (a)(2) of SMCRA, which applies to sites protected by Section 522(e)(3) of the Act,[11] requires reclamation and operation plans, which are submitted with the permit applications, to describe measures that will be used to minimize adverse impacts to those sites "[i]f valid existing rights exist." 30 C.F.R. §§ 780.-31(a)(2), 784.17(a)(2). Subparagraph (b), in contrast, which authorizes the SRAs to require permit applicants to protect historic properties through "appropriate mitigation and treatment measures," applies to all sites protected by the NHPA. *Id.* §§ 780.-31(b), 784.17(b). The primary objections of the Industry plaintiffs appear to be based on the mitigation requirements in subparagraph (a)(2), which affect applicants with valid existing rights. That provision, however, is fully authorized by SMCRA and consistent with the NHPA.

Although SMCRA does not allow OSM or the SRAs to prohibit mining on land subject to valid existing rights, 30 U.S.C. § 1272(e), the statute authorizes less extreme measures to protect sites covered by Section 522(e), in order to effectuate the balancing of interests required by the Act as a whole. *See* 30 U.S.C. §§ 1201(c)–(e),

---

**11.** Section 522(e)(3), with limited exceptions, prohibits mining that will adversely affect places listed in the National Register or publicly owned parks. 30 U.S.C. § 1272(e)(3).

(h), (k), 1202(f). OSM expressly relied on its broad authority under SMCRA in requiring permit applicants with valid existing rights to describe mitigation measures for historic properties listed on the National Register and for public parks. A.R.I 558; 52 Fed.Reg. 4260.

Moreover, section 510(a) of SMCRA authorizes the SRAs to "grant, require modification of, or deny" permit applications. 30 U.S.C. § 1260(a). That authority is not restricted by valid existing rights. Subject to the limitations of the takings clause, *see* 30 C.F.R. § 761.5, the states are not obligated to grant automatically an application for which valid existing rights are claimed.

SMCRA also provides a statutory basis for requiring the modification of permit applications, if necessary, to protect sites that are recognized by SMCRA as worthy of special consideration, such as those identified in Section 522(e)(3). That section singles out a limited class of historic properties—those actually listed in the National Register of Historic Places—for the highest level of protection available under the Act, an absolute prohibition of mining operations, subject to narrowly defined exceptions. 30 U.S.C. § 1272(e)(3). In light of the special status of National Register-listed sites under SMCRA, it does not make sense to assume that the statute leaves OSM powerless to mitigate harm to those sites when mining operations will proceed in any event under valid existing rights.

The NHPA applies to a more extensive class of historic properties than those protected by SMCRA, but it offers substantially less protection. For example, Section 106 of the NHPA applies to properties listed and eligible for listing in the National Register, but it requires the agencies only to "take into account" the effects of the undertakings on those properties. 16 U.S.C. § 470f. The practical effect of Industry plaintiffs' argument would be to afford no protection to sites *listed* in the National Register while affording protection under the NHPA to historic properties that are merely *eligible for listing* in the National Register. Such a result would contradict the statutory schemes of both SMCRA and the NHPA.

The Industry plaintiffs also argue that OSM has exceeded its authority under SMCRA by requiring applicants for exploration permits to describe "[a]ny other information which the [SRA] may require regarding known or unknown historic or archeological resources." 30 C.F.R. § 772.-12(b)(8)(iv). Again, however, the power of the Secretary under SMCRA includes authority to require this kind of information from permit applicants. It is important to emphasize again that the very purpose of SMCRA is to strike a balance between the production of coal and the protection of the environment, *see* 30 U.S.C. § 1202, and this goal cannot be achieved if there is no knowledge of whether historic properties are an aspect of the environment in the area proposed for mining.

In addition, the provisions concerning exploration permits further support the discretion of OSM and the states to require sufficient data from the applicant to allow the SRA to make an informed decision regarding permit issuance, modification, or denial. The purpose of the information collection requirements in 30 C.F.R. Part 772 is to enable OSM to comply with section 512(a) of SMCRA, 30 U.S.C. § 1262(a). As the regulations explicitly state, the data from exploration permit applicants "will be used to give the [SRA] a sufficient baseline upon which to assess the impact of the proposed exploration operation." 30 C.F.R. § 772.10.

The importance of a data base is confirmed by the legislative history of SMCRA: "Experience has shown that without a thorough and comprehensive data base presented with the permit application, . . . . [v]alid environmental factors tend to receive short shrift." *See, e.g.,* H.R.Rep. No. 218, 95th Cong., 1st Sess. 91 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad. News 593, 627. Thus, OSM delegated latitude to the states to determine what information should be required from exploration permit applicants, and how it should be collected. A.R.I 554; 52 Fed.Reg. 4256.

OSM's existing regulations require applicants for exploration permits to provide information concerning "[c]ultural or historical resources known to be eligible for listing on the National Register," 30 C.F.R. § 772.12(b)(8)(ii), and "[k]nown archeological resources" that may not even be eligible for the National Register at all, 30 C.F.R. § 772.12(b)(8)(iii). OSM has the authority to establish requirements for the purpose of, *inter alia,* expanding the data and information available to the states so that the effects of mining operations can be more accurately assessed. Section 522(a)'s provision allowing a state to collect information on historic sites for purposes of resolving petitions for unsuitability and section 507(b)'s express requirement that permit applicants supply information on known archeological sites, along with section 522(e)'s absolute protection for listed sites, evidences an intention of informed decisionmaking about historic properties that would be thwarted by the rigid rules for disinformation urged by Industry plaintiffs.

In any event, the Court of Appeals for the District of Columbia Circuit has suggested that a reasonable interpretation of the Secretary's SMCRA authority, even authority subject to a different interpretation, must be upheld. As that Court noted, "The structure of [SMCRA] may well allow for Industry's restrictive interpretation ..., but it certainly does not, as Industry asserts, preclude the reasonable interpretation adopted by the Secretary and sustained by the district court." *NWF,* 839 F.2d at 745 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). Moreover, in *NWF,* the Court emphasized the significant burden on the Industry:

> Industry ... bears a heavy threshold burden. For this court to disregard *Chevron* deference, Industry must demonstrate that Congress had a specific in-

tent that is contrary to the plain meaning of the statute, or in the alternative, that the legislative history and/or the structure of the statute demonstrate that Congress' intent was ambiguous and that the Secretary acted unreasonably in construing the statute according to its plain meaning.

*Id.* at 747. As the Court found in *NWF,* under either approach, Industry's arguments here fall well short of persuading this Court that the Secretary exceeded his authority in promulgating the regulations.

*3. Compliance With the NHPA?*

While it is clear that the Secretary is authorized to issue regulations that concern identification and mitigation of harm to historic properties, the Court must still determine whether, in promulgating the regulations, OSM has gone far enough in ensuring that federal and federally assisted undertakings comply with the NHPA. The Advisory Council explicitly defines the term "undertaking" to include a "project, activity, or program.... under the direct or *indirect* jurisdiction of a Federal agency or licensed or *assisted* by a Federal agency." 36 C.F.R. § 800.2(*o*) (emphasis added). Defendants have conceded that the Secretary of the Interior's approval of state programs for the regulation of surface coal mining, i.e. approval of primacy, is a federal undertaking within the meaning of Section 106. OSM has also conceded that once primacy has been granted, OSM's periodic review and approval of amendments and revisions to those state programs is an undertaking and that the granting of federal monies constitutes a federally assisted undertaking subject to Section 106. Finally, defendants concede that individual permit decisions on federal lands and in states where OSM operates the permitting program directly are separate undertakings.

Plaintiffs contend, however, that state permit decisions in and of themselves are federally assisted undertakings.[12] Defen-

---

**12.** National Trust plaintiffs' argument that "[u]nder Section 106, the legal responsibility for compliance remains with the federal agency directly or indirectly responsible for the federal undertaking," NT's Motion, at 21, begs the question. While it is true that the legal responsibility for a federal undertaking remains with the federal agency, the Court is asked here to deter-

dants argue, in contrast, that permits are not undertakings when they are issued in neighboring states by state agencies with delegated authority from OSM. In fact, the Secretary specifically rejected National Trust plaintiffs' argument in promulgating the regulations at issue. With regard to permitting requirements, the Secretary noted:

> Most of the comments on this section suggested that additional detail be added, consistent with the [NHPA] and the regulations which implement that Act. As explained above, [they] do not apply directly to permits to conduct surface coal mining operations issued by [SRAs]. Therefore, it is not appropriate to add such terminology.

A.R.I. 555; 52 Fed.Reg. 4257. The Court cannot agree with the Secretary's position.

Although the NHPA is plainly inapplicable where the federal agency's role is so insignificant as to allow no more than a recommendation, *see Techworld Development Corp. v. D.C. Preservation League,* 648 F.Supp. 106, 119 (D.D.C.1986), this is not a case in which the federal agency's involvement is *de minimis.* As a preliminary matter, the state permitting programs are federally funded: The development, administration, and enforcement costs of each state program are funded by federal grants in the amount of fifty to eighty percent. *See* 30 U.S.C. § 1295.

In addition, under SMCRA, although states with approved programs have exclusive authority to issue mining permits and those decisions are reviewable only under state law, *see* 30 U.S.C. §§ 1253(a), 1276(e), OSM maintains a powerful oversight role. For example, SMCRA requires OSM periodically to inspect surface mining and reclamation operations to evaluate the administration of the state programs. 30 U.S.C. § 1267(a); 30 C.F.R. Part 842. If an interested person notifies OSM of a suspected violation of a state-imposed permit condition or of the requirements of SMCRA, OSM must order a federal inspection of the mining operation immediately after the expiration of a ten-day notice period to the mine whether the state permitting decisions are

SRA and must issue a notice of violation, if appropriate. 30 U.S.C. § 1271(a)(1); 30 C.F.R. Parts 842-43. If such a violation threatens significant, imminent, environmental harm, OSM must issue a cessation order. 30 U.S.C. § 1271(a)(2); 30 C.F.R. § 843.11. Ultimately, if a state is incapable of enforcing the requirements of the state program effectively, OSM must enforce permit conditions directly and take over the entire permitting process. 30 U.S.C. §§ 1254(b), 1271(b); 30 U.S.C. §§ 733.12–.13.

This Court's conclusion that the state permitting process is a federal undertaking is supported both by the legislative history of SMCRA and by D.C. Circuit caselaw. The legislative history contains substantial expressions of dissatisfaction with state mining regulations practices:

> [D]espite claims from some quarters that state reclamation laws have improved so significantly that Federal mining standards are no longer needed, the hearing record abounds with evidence that this is simply not the case. For a variety of reasons, including the reluctance of the State to impose stringent controls on its own industry, serious abuses continue.... While it is confident that the delegation of primary regulatory authority to the States will result in adequate State enforcement, the committee is also of the belief that a limited Federal oversight role as well as increased opportunity for citizens to participate in the enforcement program are necessary to assure that the old patterns of minimal enforcement are not repealed.

H.R.Rep. No. 218, 95th Cong., 1st Sess. 58, 129 (1977), *reprinted in* [1977] U.S.Code & Ad.News 593, 596, 661. As the Court of Appeals characterized the history, "[T]he legislative history of the Act, the declarations of congressional purpose it contains, and the allocation of authority it creates between the Secretary and the states confirm that Congress was not interested in perpetuating the existing tradition of state mining regulation, and that Congress saw the need for *both federal standards and federal undertakings for purposes of the NHPA.*

*federal oversight* to guarantee an effective change." *In re Permanent Surface Mining Regulation Litigation,* 653 F.2d at 521 (emphasis supplied).

Moreover, in *Lee v. Thornburgh,* 877 F.2d 1053 (D.C.Cir.1989), the Court of Appeals for the District of Columbia Circuit had the opportunity to examine the issue of what constitutes a federal or federally assisted undertaking. In that case, neighborhood community groups and residents brought an action to block a District of Columbia prison construction project on the ground that the planning process had not complied with the NHPA. The Court held there that the Act did not apply. As the Court explained:

> The funds for the project were appropriated directly by Congress to the District. Congress did not funnel the funds through any federal agency.... Nor did Congress delegate any approval functions related to the proposed facility to any agency. Indeed, Congress expressly reserved to itself the right to approve or disapprove the site, the design and the construction plans of the prison.... Furthermore, ... [w]hile there is evidence that the District sought [the Department of Justice's] DOJ's agreement to the site and that DOJ checked with both the General Services Administration ("GSA") and the Department of the Interior to "clear" the site, none of these agencies actually claim to have had the authority to grant or refuse permission.

*Id.* at 1057.

Although OSM does not dictate primacy states' decisions on individual mining permits, OSM retains indirect jurisdiction over the state programs. It has been delegated approval functions and is statutorily required to review state permitting programs to ensure compliance. Moreover, the federal funds for primacy states are "funneled" through OSM. It is this degree of authority that renders OSM ultimately responsible for ensuring that individual permit decisions comply with the requirements of Section 106.

OSM and Industry rely on a number of cases interpreting the National Environmental Policy Act of 1969 ("NEPA") in an attempt to support their argument that permitting decisions are not federal undertakings.[13] These cases are not dispositive of the issues presented here.

For example, both OSM and Industry rely on *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board,* 453 F.Supp. 122 (E.D.Va.1978), in which the court ruled that NEPA did not apply to the issuance of a pollutant discharge permit by a Virginia agency. In *Chesapeake Bay,* however, EPA declined to exercise its discretionary authority to object to a specific permit. *Id.* at 125. The court simply ruled that the agency's discretionary decision to take no action was not a "major federal action" and did not require an Environmental Impact Statement ("EIS"). *Id. Chesapeake Bay* involved a challenge to a discretionary decision with regard to a specific permit while here, plaintiffs contend that OSM has failed to provide minimum federal guidelines that are adequate to comply with OSM's obligations under Section 106.

---

**13.** It is not at all clear that Congress intended for NEPA and the NHPA to be coextensive in their application to surface coal mining. For example, SMCRA expressly exempts certain actions from NEPA requirements, but provides no exemptions from the NHPA. *See* 30 U.S.C. § 1292(d). Moreover, Congress appears to have established different thresholds in the NHPA and in NEPA for determining whether an activity triggers the obligation to comply with the respective statutory review procedures. The threshold language of NEPA—*"major* federal action," 42 U.S.C. § 4332(C)—seems to encompass a more limited set of federal actions that those subject to Section 106 of the NHPA—*"any"* federal or federally assisted "undertaking," including those subject only to the indirect jurisdiction of the agency, 16 U.S.C. § 470f. A major federal action is defined as an action "with *effects that may be major,"* 40 C.F.R. § 1508.18. On the other hand, an undertaking is defined as "any project, *activity, or program that can result in the character or use* of historic properties." 36 C.F.R. § 800.2(*o*). Similarly, the threshold for application to NEPA of an activity appears to be higher than the NHPA threshold because Section 106 applies to any activity that *affects* historic properties, whereas NEPA applies to major federal actions that *significantly affect* the human environment, including historic properties. *But see Edwards v. First Bank of Dundee,* 534 F.2d 1242, 1245 n. 2 (7th Cir.1976); *Ely v. Velde,* 451 F.2d 1130 (4th Cir.1971).

Another case relied on by OSM is even less analogous to the instant action. *Save Our Dunes v. Pegues,* 642 F.Supp. 393 (M.D.Ala.1985), *rev'd on other grounds,* 834 F.2d 984 (11th Cir.1987), involved a challenge to the construction of a condominium complex on the Alabama coast under the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–64. The court there, however, repeatedly emphasized that the statutory scheme under the CZMA is one of "federal encouragement" rather than control, in which the only sanction available to CZMA for a state's failure to comply with the program is withdrawal of federal funding. 16 U.S.C. § 1458(d); *Save Our Dunes,* 642 F.Supp. at 404. This scheme does not remotely resemble the requirements of SMCRA under which OSM retains ultimate responsibility.

For similar reasons, OSM's and Industry's reliance on *Defenders of Wildlife v. Andrus,* 627 F.2d 1238 (D.C.Cir.1980), and *National Organization for the Reform of Marijuana Laws v. Drug Enforcement Administration,* 545 F.Supp. 981 (D.D.C.1982) ("*NORML*"), is misplaced. In the *Defenders of Wildlife* case, the plaintiffs challenged the Secretary of the Interior's discretionary decision not to use his authority under the Federal Land Policy and Management Act, 43 U.S.C. § 1714, to terminate a wolf-kill program conducted by the Alaska Department of Fish and Game. As in *Chesapeake Bay,* the court determined that the agency's wholly passive and discretionary failure to take action did not constitute a "major" federal action triggering the requirements of NEPA. 627 F.2d at 1244. And in the *NORML* case, the court found that a Florida state program to spray marijuana fields with paraquat was not subject to NEPA because the program involved no federal funding, no federal control, and no federal technical assistance— merely federal-state "cooperation." 545 F.Supp. at 984–85.

*Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Com-* *mission,* 599 F.2d 1333 (5th Cir.1979), is equally unpersuasive. There, the court held that the development of a long-range regional transportation plan did not require preparation of an EIS under NEPA. The only federal connection with the project was "the availability of federal funds for the planning process." 599 F.2d at 1347. The plan itself would *"never* be submitted to a federal agency for review or approval." *Id.* (emphasis in original). In this case, OSM is statutorily required to review state permitting programs to ensure their compliance with all federal requirements.

OSM cannot escape the duties imposed under Section 106 of the NHPA simply by delegating some of its duties to the states and yet still maintaining a powerful oversight role. Despite the indirect nature of OSM's jurisdiction in primacy states, ultimately the responsibility for compliance falls on OSM. Because the regulations promulgated by OSM on February 10, 1987 were based on the incorrect premise of the Secretary that permitting decisions in primacy states are not federal undertakings, and thus, defendants have failed to comply with Section 106, this matter will be remanded to the Secretary to take action to bring OSM into compliance with the NHPA, including, if appropriate, the promulgation of new regulations or a declaration that the present regulations apply to the state permitting process.[14]

## III. CONCLUSION

For the reasons expressed above, it is hereby

ORDERED that Industry plaintiffs' motion for summary judgment is denied. It is

FURTHER ORDERED that defendants' motion to dismiss and cross-motions for summary judgment are denied. It is

FURTHER ORDERED that Count II and Count III of National Trust plaintiff's Complaint are dismissed without prejudice. It is

**14.** Even were the Court to find, as it has, that the state permitting process is a federal undertaking, both federal defendants and Industry plaintiffs question whether summary judgment is appropriate. In light of the relief granted and the remand to the Secretary, summary judgment need not be entered in favor of National Trust plaintiffs.

FURTHER DECLARED that defendants have failed to comply with Section 106 of the NHPA and that the regulations promulgated by OSM on February 10, 1987 fail to comply with the NHPA. It is

FURTHER ORDERED that, in accordance with this Opinion, this matter is remanded to the Secretary to bring OSM into prompt compliance with the NHPA. And it is

FURTHER ORDERED that these cases are dismissed.

IT IS SO ORDERED.