OGUNQUIT VILLAGE CORPORATION
et al., Plaintiffs, Appellants,

v.

R. M. DAVIS, Administrator, Soil
Conservation Service, et al.,
Defendants, Appellees.

No. 76–1425.

United States Court of Appeals,
First Circuit.

Argued Dec. 8, 1976.

Decided April 20, 1977.

Thomas B. Bracken, Boston, Mass., with whom Bracken & Selig, Boston, Mass., was on brief, for appellants.

Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Washington, D. C., Peter Mills, III, U. S. Atty., Portland, Me., Edmund B. Clark, and Gary B. Randall, Attys., Dept. of Justice, Washington, D. C., on brief, for appellees.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

The sand dune of Ogunquit, Maine, stretches for more than a mile along the southern Maine coast. Rising twenty feet above a wide sandy beach, the dune is cut off from the mainland by salt water marshes and the Ogunquit River estuary. The dune and beach have long brought tourists to the nearby village of Ogunquit. The dune's popularity eventually proved its undoing. The grass and shrubs that held the dune in place were trampled, and the sand began to blow away. The estuary's clam flats were slowly choked by sand from the eroding dune, and sand storms drove visitors away on windy days. Mainland residents began to fear that in a winter storm the sea would break through the dune and wash away their homes. Finally the village of Ogunquit asked the federal Soil Conservation Service (the Service) for its help in restoring the dune. The Service proposed that the dune be rebuilt and replanted. An environmental impact statement was prepared and approved. Work began.

The first section of the reconstructed dune was built of sand dredged from the

Ogunquit estuary. The new dune resembled a dike; it was twenty-two feet high with a flat, twenty-five foot top and steep sloping sides. The first part of the project was completed by July of 1974. But not enough wind-blown sand could be dredged from the estuary to complete more than a fifth of the new dune. The Service sought the remaining sand from an inland source. Instead of the fine white quartz sand that is native to the Ogunquit dune, the Service bought coarse yellow sand and gravel. It began to dump this mixture on the beach in December of 1974. The job was finished in about a month. The village protested in January of 1975, but it was too late. In place of the famous white Ogunquit dune, the villagers found what to many was an ugly yellow bunker. The village, joined by several other plaintiffs, then began this suit.

The district court granted summary judgment in the Service's favor. The village appeals from only two aspects of the decision below. The district court refused to entertain the village's claim for breach of contract because the Tucker Act gives district courts jurisdiction over contract claims against federal agencies only if the claim does not exceed $10,000. 28 U.S.C. § 1346(a)(2). The village believes that the district court was obligated to accept pendent jurisdiction over the contract claim, citing *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971). Beyond noting that this case is inapposite, we agree with the court below that the village's contention "does not warrant discussion".

The second issue on appeal is more troubling. The village seeks relief under the National Environmental Policy Act of 1969 (NEPA). 42 U.S.C. §§ 4321–47. NEPA requires an environmental impact statement (EIS) whenever a federal agency proposes a major action with significant environmental effects. *Id.* § 4332(2)(C). The village objected that the EIS filed by the Service was inadequate, and the district court found merit in the attack:

"The record discloses that the inland fill used on the northerly 4,700 feet of the reconstructed dune is composed of sand, obtained from inland sources, which varies substantially in texture and color from the indigenous beach sand. Yet neither the draft nor the final EIS suggested that the inland fill to be used on this portion of the Project was to be of a texture or color different from that of the beach sand. In addition, the EIS nowhere discussed the adverse effect of the use of nonconforming fill on the aesthetics of the beach; nor did the EIS examine the availability of compatible beach sand from other sources.[18] The EIS was plainly defective in failing to provide any description of the fill to be used, the environmental consequences of using noncompatible materials, and the possible alternatives to their use."

Footnote 18 reads:

"The administrative record shows that SCS in fact investigated the possible use of beach sand from other areas on the Maine coast; but these sources were rejected, apparently because of cost and because of a desire not to deplete the supply of sand in other coastal areas."

■ The Service contended that laches barred the village's claim, but the district court rejected this argument, at least with respect to the texture and color of the sand.[1] The court stated:

"[P]laintiffs could not have discovered that the reconstructed dune was to be composed of noncompatible fill until the Project was almost complete, and . . . plaintiffs filed the present action as soon as reasonably could be expected after they had notice of the characteristics of

---

1. The village also attacked the rigidly geometric, trapezoidal shape of the proposed dune. The district court found that every formal document used in planning the project had clearly described the shape of the dune as a structure 22 feet high, with a top width of 25 feet and sides sloping at a 5:1 ratio—clearly a trapezoid.

The village received copies of these documents, some of them more than three years before the suit began; yet none of the plaintiffs in this case voiced any objection until weeks before the suit was filed. The district court correctly held that any challenge to the dune's shape was barred by laches.

the fill. It is true that the use of material from inland sources was apparently contemplated from the beginning of the Project's formulation. . . . Nonetheless, neither the draft EIS, the final EIS, nor any other planning document, gave any indication that the fill was to be anything other than sand compatible with the existing beach sand.[19] . . . [P]laintiffs registered strenuous objections as soon as the inland fill began to be placed on the dune."

Footnote 19 reads:

"Indeed, the Preliminary Investigation Report and the draft and final Work Plans may have affirmatively misled by specifying that the suitability of available inland sources would have to be investigated 'as to their textural characteristics (i. e., size, grading) . . . .' "[2]

Notwithstanding these conclusions, the court held that neither damages[3] nor equitable relief could be granted once the project was completed. In so concluding, the district court relied on decisions, including our own, which have "declined to apply NEPA to those portions of challenged projects on which construction has been completed or on which work has progressed so far that meaningful future federal decisionmaking has been foreclosed." *Essex County Preservation Ass'n v. Campbell*, 536 F.2d 956 (1st Cir. 1976); *Jones v. Lynn*, 477 F.2d 885, 889–90 (1st Cir. 1973); *Boston v. Volpe*, 464 F.2d 254 (1st Cir. 1972); *Ragland v. Mueller*, 460 F.2d 1196 (5th Cir. 1972); *Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323 (4th Cir. 1972). These cases are not precisely dispositive, and the court acknowledged that no case had been found in which a completed project had been challenged under NEPA.

We are deeply troubled by the dilemma posed by this case. The prospect that a violation of NEPA is insulated from remedy once the project is completed is disturbing. We know that if a landowner erects a building on his land which proves to be a nuisance, an equity court has power to order the structure dismantled. *See generally* F. Lawrence, Equity Jurisprudence §§ 860–68 (1929). And if two businesses merge in violation of the antitrust laws, an equity court may order divestiture. *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).

Conversely, we are disturbed at the implications of affording post-completion relief where hindsight reveals inadequacies in an environmental impact statement. If such relief were available, the case at bar might readily qualify: the project, for which $804,-000 was authorized, was completed for $443,015—a "saving" of nearly $400,000; substantial if not completely effective remedial work could be done within the amount originally allocated; no sophisticated structures would have to be dismantled. But we are disturbed by the implications of affording such relief in this case; we know of no set of workable principles that would not open up a vast number of completed projects to a flood of belated litigation. Retrospective review, with the benefit of hindsight, would predictably reveal in many projects some lapse of planning and foresight which could give rise to a law suit. The prospects of prolonged litigation and of additional, large, and unplanned expenditures of public funds in undoing and redoing what has been done would give pause to any court.

We have even considered a milder form of remedy, not asked by the plaintiffs: requiring the Service now to prepare an updated study of the alternatives available to remedy the defects complained of. This has the merit of tailoring the remedy to the specific violation, of requiring to be done now what should have been done earlier. And it could serve the purpose of informing

---

**2.** We comment, however, that to any alert reader acquainted with the dune and its sand, "inland" sand would not match fine beach sand and the only likely realistic alternative, except for retrieval of sand blown from the dune itself, would be sand from someone else's beach.

**3.** The village has seemingly abandoned its claim for damages, asking on appeal only for equitable relief. This seems wise, for their claim has as yet no support in the cases. *See Pye v. Department of Transp.*, 513 F.2d 290, 293 (5th Cir. 1975).

the public and the agencies of government as to the most practicable course to follow, leaving the provision of funds to the political processes. Here too, however, we face the problem of setting forth the criteria determining when such relief is appropriate. And once again we know of no way to afford such relief in this case without opening the door to litigation seeking such relief in a multitude of other projects. For example, were we to hold that such relief should be granted only where the defect in environmental analysis was egregious, where the defect has given rise to continuing public concern, where the plaintiffs sought relief as soon as the defect became apparent, and where the cost of further study is outweighed by the potential value to the public—conditions arguably met in this case,— we would be under no illusion that such criteria would preclude suits brought for the most minor lapses in planning.

For guidance on the parameters of our power we look to NEPA itself. As the Supreme Court noted in *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960):

"When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As this Court long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature.' "

A federal agency, under 42 U.S.C. § 4332, is obligated, inter alia, to "study, develop, and describe appropriate alternatives to, recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(D). The entire apparatus of the draft EIS, its wide circulation for comment, the final EIS, and the availability of judicial review is calculated to improve decisionmaking. While there is no requirement that an agency subordinate its other objectives to that dictated by environmental considerations, the hope of the statute is that at least the decision will be a broadly informed one.

Here a draft EIS was filed with the Council on Environmental Quality on December 29, 1972. Publication was made in the Federal Register and copies sent to federal, state, and town officials. Comments were received from EPA, five other federal agencies, six state agencies, and the Maine Audubon Society. A final EIS was filed in April, 1973, with EPA approval given in May. In September the village, after hearing the Service explain the project, voted to accept the project. Notwithstanding the fact that all of the complex and time-consuming procedures were followed, planning deficiencies were unnoticed by anyone. Wholly apart from laches, we are called upon to decide if courts should afford post-completion relief.

The law throbs with the tension between the need for right resolution in a given case and the need for finality. Affirmative defenses, if not timely raised by motion, are waived. Statutes of limitation routinely cut off otherwise valid claims. Only plain error can rescue issues which were not preserved at trial. Congress has endeavored to develop a process of exposing and balancing alternatives from an environmental viewpoint which is devised to raise the level of sophistication in federal decisions. The process puts burdens on federal agencies; but it also demands, if it is to achieve its objective, a certain duty of attentiveness from citizens. If there were more watchfulness on the receiving end, there would be much less likelihood of getting done what would, in the best of all possible worlds, call for a redoing. Absent bad faith, therefore, we think that the opportunities afforded by that process and by access to courts to challenge the adequacy of an EIS must suffice.

In this case although plaintiffs have charged defendants with acting arbitrarily and capriciously, neither pleadings nor proof suggest such a conscious design to circumvent the requirements of NEPA as would amount to bad faith. While the end result may be an unhappy one esthetically,

we can well understand that the Service, historically experienced in such utilitarian functions as preventing soil erosion, silting, and other physical damage, was not geared to the subtle objective of preserving form and texture. The Service did its job as it saw it. The plaintiffs, having different if unarticulated expectations in mind, were understandably highly critical.

In the absence of any case authority and in the light of NEPA as it now exists, we share the view of the district court that we are unable to fashion a remedy which could stand the test of general applicability. That responsibility would seem more appropriate for Congress which could specify administrative procedures for the consideration and resolution of post-completion problems.

*Affirmed. No costs.*