GETTYSBURG BATTLEFIELD PRES-
ERVATION ASSOCIATION; Dr. Wal-
ter L. Powell; Timothy H. Smith; and
Edwin R. Peterson, Plaintiffs,

v.

GETTYSBURG COLLEGE; the Gettys-
burg Railroad; Manuel Lujan, United
States Department of the Interior;
James W. Coleman; and the National
Park Service, Defendants.

Civ. A. No. 1:CV–91–1494.

United States District Court,
M.D. Pennsylvania.

July 2, 1992.

Robyn J. Katzman, Eugene E. Dice, Harrisburg, Pa., for plaintiffs.

Judith G. Hirsh, Goldberg, Katzman & Shipman, P.C., Harrisburg, Pa., for defendant Gettysburg College.

Daniel J. Sweeney, Washington, D.C., Scott W. Morgan, Morgan and Morgan, Harrisburg, Pa., John M. Cutler, Jr., McCarthy, Sweeney & Harkaway, P.C., Washington, D.C., for defendant the Gettysburg R.R.

Michael J. Kane, Harrisburg, Pa., Robert J. DeSousa, U.S. Atty.'s Office, Lewisburg, Pa., for defendants Manuel Lujan, James Coleman, U.S. Dept. of Interior and Nat. Park Service.

## MEMORANDUM

RAMBO, District Judge.

Before the court are separate motions to dismiss submitted by the federal defendants, Gettysburg College, and Gettysburg Railroad. All motions have been briefed and are ripe for consideration. Prior to examining the merits, the court will discuss the factual background of the action and the standard utilized in examining such motions.

*Background*

## I. From the Complaint and Judicial Notice of Applicable Statutes

Gettysburg National Military Park ("the Park") is administered by the National Park Service ("the NPS"), an agency of the United States Department of the Interior. In 1987, Congress enacted legislation, based on concerns about the lack of a clearly defined boundary for the Park. Congress directed the NPS to conduct a boundary study of the Park and report back to Congress within a year with recommendations regarding the "final development" of the Park. *See* Pub.L. 100–132, 101 Stat. 807 (1987), codified at 16 U.S.C. § 430g (Historical and Statutory Notes). The NPS was to consult with the community, and interested individuals and groups. *Id.* The boundary study, with accompanying Environmental Assessment was completed in August, 1988. In 1990, Congress passed further legislation. It adopted the recommended boundaries in the study, 16 U.S.C. § 430g–4(a), and excluded land outside of these depicted boundaries from the park, 16 U.S.C. § 430g–4(b). It gave the Secretary of the Interior the general authority to acquire and convey land within the park, 16 U.S.C. § 430g–5(a) & (b), and to exchange or sell federal lands excluded from the park as a result of the legislation "subject to such terms and conditions as will assure the use of the property in a manner which, in the judgment of the Secretary, will protect the park and the Gettysburg Battlefield Historic District." 16 U.S.C. § 430g–5(c).

One of the recommendations in the boundary study was the deletion of a 7.5 acre tract of land located along the boundary between the Park and Gettysburg College from the Park's boundaries for the purpose of rerouting the Gettysburg Railroad from its then current location on the Gettysburg College campus. The report characterized this deletion as involving only minor park-boundary alterations, and represented that it would have no adverse impact on known historical resources.

On September 26, 1990, this 7.5 acre federal parcel was exchanged by the NPS for conservation easements on 46.35 acres of land owned by Gettysburg College, and a sum representing the difference in value between the two. Both tracts were located within the Park Historic District.

## II. Undisputed Allegations from the Pleadings

Gettysburg College then purchased from Gettysburg Railroad the 3,600 foot segment of former rail line crossing its campus, and granted Gettysburg Railroad a right of way over the 7.5 acre parcel for the relocation of its rail. Beginning in January, 1991, the Gettysburg Railroad completed the necessary excavation for the rerouting of the tracks. At this point the construction of the new tracks is complete but a prospective railroad maintenance building has yet to be completed (the progress on the building construction is unclear from the pleadings).

The Boundary Assessment Study discussed above concluded with a Finding of No Significant Impact ("FONSI"). No environmental impact statement was done on the federal defendants' exchange of the 7.5 acres. The Boundary Assessment Study's conclusion of no significant environmental impact was not challenged on its release, nor did plaintiffs seek a preliminary injunction to block the land exchange or the construction of the tracks.

## III. The Parties and the Cause of Action

Plaintiff Gettysburg Battlefield Preservation Association ("GBPA"), a non-profit public interest corporation whose members study, respect and value the historical significance of the Park and are dedicated to maintaining its historical integrity, brings this suit both on its own and its members' behalf. Plaintiff Walter L. Powell is the President of GBPA, and uses and appreciates the Park. Timothy H. Smith, and Edwin R. Peterson use and appreciate the Park as well; Smith is a member of GBPA and Peterson is apparently not.

The complaint alleges a litany of legal claims against the defendants (Department of the Interior and its Secretary, National

Park Service and its director, Gettysburg College and Gettysburg Railroad).

Plaintiffs allege that defendants' actions with regard to the 7.5 acre parcel are violative of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq., and the Gettysburg National Military Park Boundary Legislation of 1990 ("Boundary Act"), 16 U.S.C. § 430g–4. They allege that this particular deleted acreage was historically sensitive ground which included part of the Seminary Ridge Railroad Cut, and that the NPS did not follow the appropriate procedures in deleting and conveying the parcel from the Park.

The complaint seeks a declaratory ruling and mandamus order that the federal defendants now circulate a detailed NEPA environmental impact statement on the effect of rerouting the Gettysburg Railroad, and alternatives to that rerouting, as well as an injunction directed at the private defendants to undo the land exchange, cease all construction, remove the track and facilities, and return the land to its original condition. The complaint alleges that the federal defendants similarly failed to undertake the required NHPA review prior to the transfer of the 7.5 acre parcel, and apparently seeks the court to order it be done now.

Furthermore, plaintiffs claim that defendants have violated state law by failing to obtain approval of a site development plan, as required by local ordinances, and failing to comply with Article I, Section 27 of the Pennsylvania Constitution. The complaint originally also alleged intentional fraud, and sought both unliquidated and punitive damages, both in excess of $10,000. In their response brief, plaintiffs abandoned the intentional fraud and punitive damages claims, and now assert a tort claim for the intentional infliction of emotional distress.

*Discussion*

A Rule 12(b)(6) motion to dismiss for failure to state a claim challenges the legal sufficiency of plaintiff's case: the court must decide whether, even if plaintiff could prove all her allegations, she would be un-able to prevail. *Mortensen v. First Fed. Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). In a Rule 12(b)(6) motion, the burden is on the moving party to show this. *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980); *Mortensen*, 549 F.2d at 891. When facing a 12(b)(6) motion, the plaintiff is afforded certain protections. The material allegations of plaintiff's complaint are taken as true and construed in the light most favorable to him. *Pennsylvania House, Inc. v. Barrett*, 760 F.Supp. 439, 449 (M.D.Pa.1991). However, "conclusory allegations of law, unsupported conclusions and unwarranted inferences need not be accepted as true." *Id.* at 449–50 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80). When the court addresses a 12(b)(6) motion, it may dismiss the plaintiff's complaint "only if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *D.P. Enters. Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984).

## I. NEPA

The National Environmental Policy Act ("NEPA") is "primarily a procedural statute ... designed to ensure that environmental concerns are integrated into the very process of [federal] agency decision-making." *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 274 (3d Cir.1983). It obliges the *federal government* to use all practicable means

> to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may ... preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice.

42 U.S.C. § 4331. The core NEPA requirement is found in 42 U.S.C. § 4332. That statute obligates all federal agencies to include in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment, a detailed statement on: the environmental

effect of the proposed action, any unavoidable environmental effects of the action, any alternatives to the proposed action, the relationship between local short-term environmental use and the maintenance and enhancement of long-term productivity, and any irreversible commitments of resources necessitated in the proposed action 42 U.S.C. § 4332. This statement is referred to as an Environmental Impact Statement ("EIS").[1]

■ NEPA does not require any particular substantive outcome in a given situation. The requirement to prepare an EIS merely is intended to make federal decisionmakers aware of the environmental ramifications of actions. *Pennsylvania Protect Our Water & Envtl. Resources, Inc. v. Appalachian Regional Comm'n*, 574 F.Supp. 1203, 1212 (M.D.Pa.1982), *aff'd without op., Borough of Moosic v. Appalachian Regional Comm'n*, 720 F.2d 659, 20 Envtl.Rep.Cas. 1456 (3d Cir.1983).

Here, federal defendants argue that, even assuming that plaintiffs' allegations are true and the federal defendants' exchange of the 7.5 acres was a major federal action significantly affecting the human environment and requiring the preparation of an EIS, the court lacks jurisdiction to hear this action. They characterize this as an issue of standing, or alternatively mootness.

■ Whether this is viewed as an issue of standing or mootness, the court believes that the federal defendants' argument has some merit. Under constitutional standing doctrine, the plaintiff must claim an injury to himself that is traceable to the challenged action and *likely to be redressed* by a favorable court decision. *See, e.g., Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *City of Los Angeles v. National Highway Traffic Safety Admin.*, 912 F.2d 478, 483 (D.C.Cir.1990). In addition, the Administrative Procedure Act, the procedural route for a NEPA claim,

requires the plaintiff's injury to fall within the zone of interests sought to be protected by the statute forming the legal basis for his complaint. 5 U.S.C. § 702; *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Under mootness doctrine "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence...." *See, e.g., South East Lake View Neighbors v. Department of Housing & Urban Dev.*, 685 F.2d 1027, 1039 n. 9. (7th Cir.1982). Here federal defendants argue that, because NEPA only applies to *federal* projects, courts only have the authority to apply it in situations where there is continuing federal involvement in the challenged project. They argue that the redress sought by plaintiffs is no longer available because federal involvement with the 7.5 acre parcel at issue has long since ended, and all control over the parcel lies in the hands of private parties: NEPA cannot be used to force the federal defendants to issue an EIS, or to limit the conduct of private parties in an essentially private project. Gettysburg College, and Gettysburg Railroad make similar arguments.

Federal defendants have submitted a very extensive and thoughtful memorandum opinion written by a district court in the Seventh Circuit, *Environmental Rights Coalition, Inc. v. Austin*, 780 F.Supp. 584 (S.D.Ind.1991), now reported at 780 F.Supp. 584 (S.D.Ind.1991), which this court hereby adopts. The latter opinion is directed to whether or not NEPA provides a remedy for the failure of GSA to complete an EIS prior to selling a federally owned parcel of land, once title to the federal land has passed to a non-federal entity.

In the *Austin* case, the plaintiffs brought a NEPA action against the GSA and local county officials over a 1,508 acre parcel, formerly used as farmland, which had been sold by GSA to a local county.

---

**1.** Regulations passed pursuant to NEPA usually require an Environmental Assessment ("EA") report to be completed as a preliminary inquiry into whether an EIS is needed. The EA may conclude with a Finding of No Significant Im-

pact ("FONSI"), which is a conclusion that the proposed action is not a major federal action significantly affecting the environment, eliminating the need for a more detailed Environmental Impact Statement.

GSA sold the land knowing that the county planned to develop it for industrial use. Prior to the sale, GSA had completed an EA with a FONSI; no EIS was done. Subsequent to the sale, it became public knowledge that the county was itself negotiating to sell the parcel to a buyer who planned to construct both a paint manufacturing facility and a hazardous waste facility on the site. The plaintiffs sued the county officials and the GSA, hoping to void the sale of land that had occurred and force the return of the acreage to the federal government pending completion of an EIS. The *Austin* court concluded that NEPA provided no remedy in such a situation. While this court will not attempt to duplicate the *Austin* opinion, it will summarize the points made.

The *Austin* court emphasized that the purpose of NEPA was not to "invest in the general public the prerogative to demand environmental change," but "to require federal agencies to take a 'hard look' at the environmental equation before engaging in major federal action." *Austin*, 780 F.Supp. at 593. NEPA's express language and penumbral case law provide no authority, said the *Austin* court, to constrain any parties other than federal agencies, unless those non-federal parties are somehow closely associated with a federal agency. *Id.* at 594. "Without the requisite involvement in a project by a federal agency the project simply does not involve 'major federal action' [necessary to trigger NEPA requirements] no matter how much the project may impact the environment." *Id.* The *Austin* court recounted the search by various courts for theories under which non-federal entities can be said to have the requisite involvement with the federal government to be constrained under NEPA, ways in which private projects can be termed "federal" for purposes of NEPA. Such theories apply, for example, when the circumstances of the project relationship can be said to indicate that a non-federal entity has consented to federal regulation, when a non-federal entity accepts federal funding for the challenged project, when a non-federal entity grants the ability to control the outcome of the challenged project

to a federal agency, and when a non-federal entity is in a "joint venture" with a federal agency. *Id.* at 594–96.

▪ By abstracting out common elements of the cases it surveyed, the *Austin* court formulated a test to determine if non-federal projects/entities may be constrained under NEPA pending the completion of an EIS, a test with which this court agrees. *Id.* at 595. The test is a two part one: (1) whether the project at any time involved a major federal action, and, if so, (2) whether there is continuing agency involvement in the challenged project such that termination or modification of the agency involvement would terminate or significantly impact the project. *Id.* If the answer to each of these prongs is affirmative, then the type of federal agency project control necessary for courts to reach non-federal entities under NEPA exists.

The *Austin* court defended its approach as closely tracking the express language of NEPA which "does not speak of 'partnerships', 'joint ventures' or even 'control,' " *id.* at 596, but of federal government agencies. Given that a federal agency is the only entity that can be ordered to prepare an EIS, the EIS requirement is useful only if there are continued federal agency decisions to be made. *Id.* If agency involvement in a project is over, courts should decline to apply NEPA because to require it at that stage would be pointless; the agency has no capability to significantly alter the project. *Id.*

▪ In the case at bar, the complaint does not allege any ongoing federal involvement in the challenged project. Plaintiffs have not disputed defendants' observation that the NPS and Department of the Interior have no continuing control over the land acreage and rail project. Their argument is more generally addressed to the availability of relief after a project has been substantially or fully completed, rather than the more specific issue of availability of relief once *federal* involvement in the project has ended. *Austin* adequately addresses this argument, and plaintiffs' cited cases. Given the lack of any showing or

allegation of any continuing control by federal defendants over the challenged project, NEPA provides no jurisdiction to order an EIS or enjoin private parties here.

Plaintiffs have made a second argument: that the court has authority to address the situation in the case at bar because it was caused by bad faith on the part of the defendants. The complaint contains somewhat conclusory allegations that the defendants intentionally disregarded the requirements of NEPA, that they intentionally withheld information from the public regarding the location of the 7.5 acre parcel at issue, that they intentionally misled the public into believing that the relocation would not have an adverse impact on the historical integrity of the Park, and that all defendants intentionally planned the land transfer in a deceptive manner so as to preclude any challenge by the public.

In *Austin,* the court stressed that a possible exception to its two prong test might be presented where a non-federal entity joins a federal agency in a conscious scheme to avoid the strictures of NEPA. *Id.* at 596 n. 15. Because no allegations of bad faith were made in *Austin,* the court found it unnecessary to reach this issue. *Id.* at 596 n. 15. However, it noted in dicta its belief that without significant agency involvement, even where bad faith was alleged, it would take a stretch to find that NEPA provided a basis to interfere with the action of non-federal entities. *Id.* at 596.

While plaintiffs' approach may seem initially attractive, the court concludes that it is neither required under NEPA nor practically workable.

The court agrees with the *Austin* court that, absent the requisite federal involvement, the court has no authority to order an EIS or constrain private actions under NEPA. And the court sees no indication that considerations of bad faith should play any part in the legal inquiry as to whether such federal involvement exists. Plaintiffs have cited a number of cases in which the court has made some suggestion in dicta that bad faith is an operative consideration in whether the court has authority to apply

NEPA to completed projects. However, the factual contexts in these cases do not involve private projects with no ongoing federal control. The court will briefly address them.

In *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 591 n. 1 (9th Cir.1981), the plaintiffs sued unsuccessfully to enjoin the construction of a power transmission line. At the time of the appeal, all 191 towers required for the line had been constructed, and the line had been operational for several years. The defendants challenged the action as moot, but the *Columbia Basin* court noted that if it found the relevant EIS to be inadequate (it did not), it had the power to order a new one and ultimately remove the electrical power transmission line at issue. The court reasoned that to decide otherwise would be to possibly allow an agency to ignore NEPA, build *its* structures before a case gets to court, and then hide behind the mootness doctrine. However, in *Columbia Basin* there was significant ongoing federal involvement present to trigger NEPA coverage under the *Austin* test enunciated above so that the court could proceed to consider the substantive EIS issues. The power line project was built and being operated by the Bonneville Power Administration, an agency of the Department of the Interior, with no no-federal entities involved.

In *Richland Park Homeowners Ass'n, Inc. v. Pierce,* 671 F.2d 935 (5th Cir.1982) the plaintiffs sought to enjoin HUD from providing federal financial assistance for the construction and operation of an apartment complex for low income families, on the ground that HUD's environmental assessment procedures in deciding to finance the project had violated NEPA. Although the *Richland Park* court affirmed an earlier finding that the relevant EIS was adequate, it noted that the result might have been different if the plaintiffs could have shown blatant bad faith on the part of HUD. *Id.* at 938, 943. However, again, there was already sufficient ongoing federal involvement in the apartment complex to satisfy the *Austin* test. The HUD con-

struction financing mandated that 20% of the units in the project be reserved for qualified low income tenants who were to pay no more than 25% of their monthly income for rent, and HUD continued to pay the apartment complex owner the remainder of the monthly fair market rent for these units. *See id.* at 940.

In *Environmental Defense Fund v. Marsh*, 651 F.2d 983 (5th Cir.1981), the plaintiffs brought suit alleging that the environmental assessment procedures of NEPA had been violated in the planning and construction of a water project which was currently half completed. The *Marsh* court granted a temporary injunction affecting only part of the waterway, pending submission of a supplemental EIS. *Id.* at 1007. While the court noted its reluctance to interfere with a Congressionally authorized project which was half done, it defended the result on the basis that the plaintiffs had established NEPA's blatant violation. *Id.* at 1006. However, again there was significant ongoing agency involvement: The project was planned and was being constructed by the U.S. Army Corps of Engineers, with no non-federal entities involved.

*Ogunquit Village Corp. v. Davis*, 553 F.2d 243 (1st Cir.1977), is the final case cited by the plaintiffs on this issue. In *Ogunquit Village*, the federal Soil Conservation Service contracted with a village to rebuild and replant an eroded dune located on village property. After the federal reconstruction project was complete, the village, dissatisfied with the results, brought suit under NEPA, alleging an inadequate EIS. Absent allegations of bad faith, the First Circuit said it was unwilling to afford any post-completion relief under NEPA. *See id.* at 246. Again, this case involved no non-federal entities: the project was a federally planned and executed one.

As can be seen above, the cases cited by the plaintiff provide little support for the proposition that allegations of bad faith should play any part in the NEPA inquiry as to whether sufficient federal involvement is present in a private project to "federalize" it for purposes of NEPA. Putting aside for a moment the above legal argument that NEPA does not reach cases such as the one at bar, the First Circuit's compelling discussion in the *Ogunquit Village* case mirrors the *practical* concerns this court has with formulating an exception to NEPA's explicit reach if there are allegations made of bad faith. *Ogunquit Village* contains a discussion of the *wisdom* of allowing post-completion NEPA relief in cases "where hindsight reveals inadequacies in an environmental impact statement." [2] The First Circuit noted that to routinely allow such relief would be to open up a floodgate of belated litigation. *Id.* at 245. Furthermore, the First Circuit characterized even the task of formulating criteria determining when corrective action might be available for egregious defects in environmental analysis as hopeless. It predicted that a floodgate of litigation would nevertheless be brought for even the most minor lapses in federal planning. *Id.* at 246. The solution, as the First Circuit saw it was to depend on "the duty of attentiveness from citizens:"

> The law throbs with the tension between the need for right resolution in a given case and the need for finality. Affirmative defenses, if not timely raised by motion are waived.... Congress has endeavored to develop a process of exposing and balancing alternatives from an environmental viewpoint which is devised to raise the level of sophistication in federal decisions. The process puts burdens on federal agencies; but it also demands, if it is to achieve its objective, a certain duty of attentiveness from citizens. If there were more watchfulness on the receiving end, there would be much less' likelihood of getting done what would, in the best of all possible worlds, call for a redoing. *Absent bad faith*, therefore,

**2.** The *Ogunquit* discussion referred to here is undoubtedly addressed to completed *Federal* projects ("The prospects of prolonged litigation and of additional ... and unplanned expenditures of *public* funds in undoing and redoing

what has been done would give pause to any court." *Ogunquit*, 553 F.2d at 245 (emphasis added)), but is a practically persuasive discussion when directed at private projects in which federal control is no longer present.

we think that the opportunities afforded [to challenge an EIS] ... must suffice. *Id.* at 246. Use of bad faith as a criteria for intervention in cases such as the one at bar would not, as the *Ogunquit* dicta might suggest, be a solution.[3] The floodgate of potential litigation would not be stemmed: instead, parties would simply make conclusory allegations of bad faith and then undertake extensive agency discovery, fishing for some bit of information to support the allegations.

For the above reasons, the motion to dismiss the NEPA claim will be granted for all defendants.

## II. NHPA and Boundary Revision Act

■ Another basis for plaintiffs' suit is § 106 of the National Historic Preservation Act, 16 U.S.C. 470f, which requires the "head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking" and the "head of any Federal Department or independent agency having authority to license any undertaking" to "take into account the effect of the undertaking on districts, sites, or buildings included in the National Register," giving an opportunity to comment on the undertaking to the National Advisory Council on Historic Preservation. 16 U.S.C. § 470f. Like NEPA, NHPA is essentially a procedural statute, and does not dictate a particular outcome.

*Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 278 (3d Cir.1983); *United States v. 162.20 Acres of Land,* 639 F.2d 299, 302 (5th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981).

It is undisputed that Gettysburg National Military Park is included on the National Register. Defendants argue that, even assuming that a § 106 review should have been done prior to the federal defendants' exchange of the 7.5 acre land parcel, NHPA, like NEPA, provides no redress in the circumstances of this case. Plaintiffs have addressed no separate argument to the NHPA issue, apparently assuming, as all defendants' argue, that the reach of NEPA and NPHA is identical in this case. The court agrees.

For purposes of this motion, it is unnecessary to determine if the substantive reach of NEPA and NHPA is actually coextensive.[4] It is enough that both require federal involvement: NEPA applies to a proposed "major federal action," and NHPA, either to a proposed "Federal or federally assisted undertaking" or one over which a federal agency has potential licensing authority. Although the case law addressing NHPA is far less extensive than that addressing NEPA, this court is persuaded that the invocation of NHPA involves a similar search for federal involvement as NEPA,[5] and that if the relevant

---

3. The court does not mean to suggest that bad faith is never a relevant consideration in NEPA cases. It is often a factor considered, *once NEPA has been determined to apply to a challenged project,* in the determination of whether the environmental assessment procedures actually followed by the agency were adequate. *See, e.g., County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1375, 1388–89 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Daly v. Volpe,* 514 F.2d 1106, 1109, 1111 (9th Cir.1975); *Pennsylvania Protect Our Water & Envtl. Resources, Inc. v. Appalachian Reg. Comm'n,* 574 F.Supp. 1203, 1213 (M.D.Pa. 1982), *aff'd without op., Borough of Moosic v. Appalachian Regional Comm'n,* 720 F.2d 659, 20 Envtl.Rep.Cas. 1456 (3d Cir.1983). However, the court's conclusion here is that it is not a relevant factor in whether a challenged project is a "major *federal* action" to which the requirements of NEPA apply.

4. *See Edwards v. First Bank of Dundee,* 534 F.2d 1242, 1245 n. 2 (7th Cir.1976) ("it is clear that the scope of the NHPA is no broader than that of the NEPA."). *See also U.S. v. 162.20 Acres of Land,* 639 F.2d 299, 304 n. 5 (5th Cir.1981) (in decision regarding NHPA and condemnation, court relies on "analogous" cases dealing with NEPA.) *Compare Indiana Coal Council, Inc. v. Lujan,* 774 F.Supp. 1385, 1402 (D.D.C.1991) (not clear that NEPA and NHPA coextensive in application to coal mining. NEPA threshold of significant effect on environment seems higher than that of NHPA threshold of effect on historic properties, and NEPA applies to major federal actions, while NHPA to federal or federally assisted undertakings.)

5. *See, e.g., Edwards v. First Bank of Dundee,* 534 F.2d 1242, 1245–46 (7th Cir.1976) (need for FDIC approval when bank transfers its operating location *did not* make bank's demolition of

federal agency retains no authority to terminate or significantly impact the project, a NHPA remedy similarly makes no sense. The court finds support for this proposition in the following cases.

In *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271 (3d Cir.1983), the federal Department of Housing and Urban Development ("HUD") appealed a district court injunction on a town's demolition of an historic building until HUD could conduct the appropriate NHPA and NEPA review. HUD argued that the trigger point of NHPA (and NEPA) occurred at the time HUD approved the proposed urban renewal plan of which the demolition was a part. At that time the relevant building was not listed or eligible for listing on the National Register. The district court concluded that "as long as HUD retains the authority to make funding approvals and give continuous permission to acquire properties, demolish buildings, and change the Urban Renewal Plan [through the relevant Loan and Grant Contract] ... [NHPA] applies...." *Id.* at 279. The Third Circuit affirmed the district court's injunction, finding that there were at a minimum several occasions subsequent to the initial HUD approval of the urban renewal plan in which HUD was provided an opportunity to demand alterations in it or to withhold federal funding. *Id.* at 282.

In *Vieux Carre Property Owners, Residents & Assoc., Inc. v. Brown,* No. 87–3700, 1990 WL 120626 (August 14, 1990 E.D.La.), an historic preservation group sued the Army Corps of Engineers over a completed privately owned waterfront amusement park, claiming the Corps had failed to complete the review process specified in NHPA, and seeking an order to have it do so. The district court dismissed the action because the authorizing Army

Corps of Engineers permit for the park was a "nationwide" one, and the pertinent case law and regulations did not specify whether the Corps retained any authority to modify, suspend or revoke such permits once a project was complete. 1990 WL 120626 at *1. The court concluded the permit was effectively "expired" and that the relief sought by plaintiff was no longer available, making the action moot. *Id.* at *2. The court noted that ordering historical review at this point would unduly penalize private developers who acted in reliance on the Corps' representation that the project could proceed, and would allow the plaintiff to do indirectly what it could not do directly: claim against non-federal defendants under NHPA. *Id.*

In *Vieux Carre Property Owners, Residents & Assoc. Inc. v. Brown,* 948 F.2d 1436 (5th Cir.1991), the Fifth Circuit reversed the trial court's order dismissing the action, and remanded for fact-finding. The Fifth Circuit stressed the impropriety of the district court's assumption that the *Morris County Trust* rule that "NHPA be applied to ongoing Federal actions as long as a Federal agency has opportunity to exercise authority at a stage ... where alterations might be made to modify its impact on historic preservation goals" did not apply to privately funded and completed construction projects. *Id.* at 1445. It noted that, *in an otherwise living case,* an action was not moot unless there was no effective relief available. *Id.* at 1446. The Fifth Circuit concluded that "NHPA review is required as long as a federal agency has the ability, under any statute or regulation, to require changes to the federal license authorizing a project." *Id.* at 1449.

 These cases persuade the court that the result here under NHPA should be identical to that under NEPA: in the ab-

historical building on property purchased for new office a federal or federally assisted undertaking for NHPA purposes); *Miltenberger v. Chesapeake & Ohio Ry. Co.,* 450 F.2d 971, 974 (4th Cir.1971) (both NEPA and HNPA directed to federal agencies and where no federal agencies involved in prospective demolition of historic hotel once used as rail station, both statutes inapplicable); *Indiana Coal Council, Inc. v.*

*Lujan,* 774 F.Supp. 1385, 1401 (D.D.C.1991) (NHPA plainly inapplicable where agency's role is so insignificant as to allow no more than recommendation, but in case where plaintiffs challenged final federal regulations regarding state mining permit process, federal involvement not *de minimis:* state permit programs developed, administered and enforced with up to 80% federal funds).

sence of ongoing federal involvement and control there is no jurisdiction for a federal court to order a federal agency to undertake NHPA review or to enjoin the project of private actors. This is not an "otherwise living case" and the redress sought is unavailable.

■ This court has located no real substantive case law regarding the Boundary Revision Act, but it is persuaded that plaintiffs have no action under it, because (1) again, it is similarly directed at a federal agency and does not provide for after the fact remedies once that agency is no longer involved, and (2) it is this court's understanding that the very land exchange objected to here was authorized by Congress in that act, when it explicitly accepted the boundaries suggested in the study and explicitly authorized the exclusion and disposal of excluded parcels (among them the 7.5 acre one) specified in the study.

III. The State Claims

Plaintiffs have also alleged that the defendants have failed to comply with the Pennsylvania Constitution and municipal ordinances and are liable to plaintiffs under tort law.

### A. The Claims Under the Municipal Ordinances and the Pennsylvania Constitution.

Plaintiffs have alleged that the federal defendants violated Gettysburg borough planning ordinances enacted under the authority of the Pennsylvania Municipalities Planning Code, 53 Pa.Cons.Stat.Ann. § 10101, *et seq.* According to plaintiffs, these borough ordinances require submission and approval of proposed subdivision and land development projects. Plaintiffs claim that the federal defendants' conveyance of the 7.5 acre parcel was a subdivision and that prior borough approval should be sought for it. Plaintiffs also allege that the federal defendants have violated Article I, Section 27 of the Pennsylvania Constitution, which states:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and aesthetic values of the environment. Pennsylvania's

public natural resources are the common property of all the people.... As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

*See Borough of Moosic v. Pennsylvania Pub. Util. Comm'n,* 59 Pa.Commw. 338, 429 A.2d 1237, 1239 (1981). The federal defendants raise a defense of sovereign immunity.

■ It appears from the complaint and pleadings that this suit is one against federal agencies and their administrators in their official capacities. Generally, an action against such federal officers is deemed a suit against the federal government if the requested judgment would operate against the government. *Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 1052–53, 10 L.Ed.2d 191 (1963). A judgment operates against the government when it would affect the government's fiscal, proprietary, or programmatic interests or interfere with public administration. *See* Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 14 *Federal Practice & Procedure* § 3655 at 218; *Gordon,* 373 U.S. at 58, 83 S.Ct. at 1052–53 (where relief sought would require federal officer's official action, affect public administration of government agencies and cause disposition of government property, suit was one against federal government); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947) (where relief sought would expend itself from public treasury or domain, or interfere with public administration, suit was one against the sovereign). In this instance, the relief sought, apparently a recision of the land exchange, and an order to obtain municipal and/or state approval before it could recur, would operate against the federal government: it would affect agency administration, require official acts by the federal agencies involved, and affect the disposition of federally owned property.

■ When the real party in interest is the federal government, sovereign immunity applies, unless Congress has waived such immunity through the passage of statutes expressly authorizing such actions.

*United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (quoting *United States v. Sherwood,* 312 U.S. 584, 587–88, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941)); *Jaffee v. United States,* 592 F.2d 712, 718 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). Such statutory waivers are strictly construed and not lightly extended. *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938 (1983).

■ Federal defendants argue that there is no federal statutory waiver of immunity applicable here. Plaintiffs have not responded to this argument.[6] Although federal defendants have not raised this point, the Administrative Procedure Act ("APA") has been held to constitute an express waiver of sovereign immunity under certain circumstances. The relevant provisions of the APA are as follows:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof ... [by action in federal court] seeking relief other than money damages ... [Such] [a]n action ... shall not be dismissed ...

on the ground that it is against the United States....

5 U.S.C. § 702. *See Jaffee,* 592 F.2d at 718. This waiver of immunity for nonmonetary claims against federal agencies applies where the action involves matters which arise under the Constitution, laws or treaties of the United States, as per 28 U.S.C. § 1331. *Id.* at 718, n. 12. *See also Acosta v. Gaffney,* 558 F.2d 1153, 1155–56 (3d Cir.1977) (APA not independent source of subject matter jurisdiction, but confers standing on party suffering injury because of agency action or adversely affected by agency action within meaning of Immigration and Naturalization Act).

■ With regard to the borough ordinance and state constitutional claim, the relevant agency act was not an agency act "within the meaning of a relevant [federal] statute," or arising under the Constitution or federal law, but an omission to act under local and state law. Hence, the court believes that the Administrative Procedure Act's waiver of immunity would not extend to the current situation, and that the federal defendants are indeed immune from these claims based on state law.[7]

---

6. Instead, plaintiffs suggest that the "correct" argument for federal defendants is preemption, not immunity, and proceed to shoot down the non-existent preemption argument. The court would have preferred plaintiffs to have addressed the argument made by defendants, rather than to have invented another. Here, the issue is not whether a third party shall be governed by state or federal law, but whether the federal government can be sued under a municipal ordinance and a state constitution.

7. Even if sovereign immunity were not an available defense, alternative bases for dismissal of these claims exist. The clear wording of and the case law surrounding the particular constitutional Article relied on indicate that it establishes a duty on the part of *state and local officials,* not the federal government or private parties, to conserve the environment.

Hence, the Article has been the basis of actions by the Commonwealth on behalf of citizens or actions by citizens against Commonwealth agencies which ignore this duty while carrying out their responsibilities. *See Riehl v. Millcreek Township Sewer Auth.,* 26 Pa.Commw. 70, 362 A.2d 478, 481 (1976) (Article charges state government agencies to act within their power as trustees of natural resources and to make reasonable efforts to protect and preserve

those resources); *Community College of Delaware County v. Fox,* 20 Pa.Commw. 335, 342 A.2d 468, 481–82 (1975) (boroughs, townships and cities are trustees just as certainly as Commonwealth agencies are); *Payne v. Kassab,* 468 Pa. 226, 361 A.2d 263, 272, *aff'd,* 468 Pa. 226, 361 A.2d 263 (1976) (Article creates a public trust of public natural resources and Commonwealth is made the trustee, commanded to conserve and maintain them).

The case at bar also falls within a line of precedent holding that, under the Supremacy Clause of the federal constitution, a federal enclave may not be regulated by state law absent explicit authorization by Congress. *See, e.g., Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (federal facilities not required to obtain state permit regarding compliance with state air quality standards) (superseded by later statute); *E.P.A. v. California St. Water Res. Control Bd.,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976) (federal facilities not required to obtain state permit regarding compliance with state water quality standards) (superseded by later statute); *United States v. State of Montana,* 699 F.Supp. 835 (D.Mont.1988) (state may not enforce its building code against federal military installation); *Town of Beverly Shores v. Lujan,* 736 F.Supp. 934 (N.D.Ind.1989) (town

### B. Federal Torts Claim Action

■ Plaintiffs originally alleged a state tort claim of fraud against the federal defendants, but "recogniz[ing] the doctrine of sovereign immunity," they have substituted a tort claim for the intentional infliction of emotional distress. As plaintiffs realize, the Federal Tort Claims Act, the statute which waives the doctrine of sovereign immunity of the United States from suit for tort injuries caused by its employees, recognizes a number of exceptions to its statutory waiver. These exceptions, which are listed in 28 U.S.C. § 2680(h), include claims "arising out of ... misrepresentation ... [and] deceit." 28 U.S.C. 2680(h).

Federal defendants allege that plaintiffs' new claim of intentional infliction of emotional distress is merely their former fraud claim in disguise, and should be excluded on that basis. They urge the court to look beyond the plaintiffs' stated tort theory to the actual substantive allegations, which arise out of fraud. There is indeed a significant legal precedent in Federal Tort Claims Act cases for courts to look beyond the asserted legal theories to the substance of the acts claimed, in order to determine if the claim in reality arises from one of the legal theories excluded by 28 U.S.C. § 2680. *See, e.g., Sheehan v. United States*, 896 F.2d 1168, 1170–73 (9th Cir. 1990); *Fitch v. United States*, 513 F.2d 1013, 1015 (6th Cir.), *cert. denied*, 423 U.S. 866, 96 S.Ct. 127, 46 L.Ed.2d 95 (1975); *Cross Bros. Meat Packers v. United States*, 533 F.Supp. 1319, 1321–22 (E.D.Pa. 1982), *rev'd on other grounds*, 705 F.2d 682 (3rd Cir.1983). However, this step is

unnecessary here. This court is persuaded that it lacks the jurisdiction to address plaintiffs' federal tort claim.

Federal defendants · correctly state that the Federal Tort Claims Act (the "Act") contains a procedural prerequisite to a court action under it: the claimant must first submit his or her claim, stating a sum certain in damages[8], to the appropriate federal agency. That agency must issue a final denial in writing of the claim, or fail to dispose of it within six months (deemed a denial). 28 U.S.C. § 2675(a). This requirement for administrative exhaustion has been strictly construed by courts which view it as a jurisdictional bar. *See Livera v. First Nat. State Bank*, 879 F.2d 1186, 1194 (3d Cir.), *cert. denied, Livera v. Small Business Admin.*, 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 322 (1989); *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301, 1306 (5th Cir.), *reh'g denied en banc*, 829 F.2d 1124 (5th Cir. 1987), *cert. denied, Wolin v. United States*, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988); *Tuttle v. United States Postal Serv.*, 585 F.Supp. 55, 56 (M.D.Pa. 1983), *aff'd without op.*, 735 F.2d 1351 (3d Cir.1984).

In this instance, plaintiffs have characterized their intentional infliction of emotional distress claim as one under the Federal Tort Claims Act, *see* Plaintiffs' Response to Federal Defendants' Motion to Dismiss at 21–22, but neither their complaint nor any of their briefs allege that they have undertaken the requisite prior administrative route at the agency level. In fact, federal defendants state that plain-

---

may not enforce traffic control ordinances against federal plan to establish parking spaces at federal lakeshore park); *Stewart v. United States Postal Service*, 508 F.Supp. 112 (N.D.Cal. 1980) (Postal Service need not comply with local ordinances in building facility unless Congress so decides in a statute). *Cf. United States v. City of Pittsburgh*, 661 F.2d 783 (9th Cir.1981) (Municipal trespass ordinance requiring mail carriers to obtain consent from residents before crossing their lawns unduly interfered with carriers' federal duty to efficiently deliver mail and Congress' objectives; ordinance unconstitutional under federal Supremacy Clause).

In this instance, the Park is a federal enclave, and there is no question that the NPS and De-

partment of Interior were administering a command by Congress to set a consistent boundary for the Park, and to dispose of those properties not within that boundary in a consistent manner. No statutory authorization by Congress exists for the project to be subjected to what would essentially be a licensing decision by the state/locality.

**8.** *See Livera v. First Nat'l State Bank*, 879 F.2d 1186, 1195 (3d Cir.), *cert. denied, Livera v. Small Business Admin.*, 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 322 (1989); *Bialowas v. United States*, 443 F.2d 1047, 1050 (3d Cir.1971); 28 C.F.R. § 14.2.

tiffs have *not* exhausted this route. Hence, this court has no jurisdiction to consider the federal claim for intentional infliction of emotional distress.

## IV. The Remaining Defendants

As a result of the foregoing, all claims over which this court has original jurisdiction will be dismissed. With regard to the remaining state law claims against the private defendants, the court declines to exercise supplemental jurisdiction over them, and will remand these claims to state court. *See* 28 U.S.C. § 1367.